**Josephine Ann SLEEK, Plaintiff,**

v.

**J. C. PENNEY COMPANY, Inc., a Delaware Corporation, Defendant.**

**Civ. A. No. 15322.**

United States District Court
W. D. Pennsylvania.

July 18, 1962.

James P. McArdle, Pittsburgh, Pa., for plaintiff.

Bruce R. Martin, Pittsburgh, Pa., for defendant.

**WILLSON, District Judge.**

On January 5, 1955, plaintiff, then 52 years of age, suffered a fall in defendant's department store. On January 3, 1957, she filed her complaint charging defendant with negligence. At the conclusion of a five day trial and after deliberating ten hours, the jury found for the plaintiff and awarded her damages in the sum of $10,000.00.

She has a lengthy history of illness and one serious injury from a fall which occurred in the year 1949. According to her physicians, her obesity was the cause of much of her illness. At the time of trial in January, 1962, she weighed 180 pounds. Neither party is satisfied with the verdict and judgment which has been entered for the plaintiff in the amount awarded by the jury. Defendant has filed a timely motion for Judgment N.O.V. in accordance with the prior motion of its counsel for a Directed Verdict. Plaintiff wants a new trial. Plaintiff's counsel says the low verdict arose and springs from bias and prejudice on the part of the trial judge directed towards plaintiff and her counsel, as well as numerous trial errors which occurred during the trial.

As trial judge, in my opinion, the trial was conducted in a calm, dispassionate atmosphere without rancor between counsel or between the court and counsel, and with full judicial decorum. Plaintiff's counsel, James P. McArdle, Esq., is a leading negligence trial lawyer at the Pittsburgh Bar. Counsel for the defendant, Bruce Martin, Esq., is a skilled and experienced defense trial lawyer. In the trial of this case both lawyers exercised their skill in the art of advocacy in the highest degree. The case was hard fought from the beginning to the end.

A unique feature of plaintiff's motion for a new trial is that the thrust of the motion is directed solely at the trial judge rather than the weight of the evidence, the defendant or its counsel. As trial judge, I think plaintiff won her case. I understand Mr. Martin for the defendant is of the same opinion. But Mr. McArdle and his client believe that the verdict was unfavorable to them.

Mr. McArdle's charge of prejudice against me as a trial judge is not hard to accept in a personal sense because I feel that both he and his client had a fair and impartial trial. A judge's impartiality and freedom from prejudice is, like a woman's virtue, easy to challenge but difficult to defend. My own opinion is that the size of the verdict is a result of the weakness in plaintiff's case, both on the issue of liability and damages, which Mr. Martin very adroitly emphasized to the jury.

**I—PLAINTIFF'S MOTION FOR NEW TRIAL**

As the rule requires, plaintiff's counsel has stated with particularity the grounds of his motion for a new trial. The motion is in eleven numbered paragraphs. The first paragraph and the tenth paragraph charge me, as trial judge, with prejudicial conduct which denied plaintiff a fair trial. The charge made requires some comment. However, if the charges of prejudice made by plaintiff are substantiated, certainly plaintiff should have a new trial. If, on the other hand, they are not substantiated, then trial errors, if any, were harmless within the meaning of Rule 61 of the Federal Rules of Civil Procedure, 28 U.S. C. as they did not affect the substantial rights of the parties and therefore should be disregarded.

In Reason 1(a) counsel states that the Court, by a selective dismissal of the instant action in the pretrial stage and the circumstances in which the Court reinstated this action, was the result of a prejudicial attitude on the part of the Court. I do not mind saying that the word "selective" disturbs me as one of the Judges of this Court. It indicates that I reached into the docket and pulled this case out for dismissal because of some bias or prejudice against plaintiff or her counsel. The record will show, however, as set out in my opinion, Sleek v. Penney Co., D.C., 26 F.R.D. 209, (1960), that on February 17, 1960, Judge McIlvaine, as the Judge in charge of miscellaneous matters, entered his Order directing counsel to comply with Rule 5 (II) within seven days or be held in default. In the routine of the division of business of the Court, I was the next Judge in charge of miscellaneous matters. This case came before me because plaintiff's counsel failed to comply with Judge McIlvaine's Order. I was faced, at that point, with, either wholly disregarding a brother Judge's Order or taking the only action possible. Thereafter, the dismissal went to the Court of Appeals and was returned for further consideration, Sleek v. J. C. Penney Company, 292 F.2d 256 (3 C.C.A., 1961). After a hearing, by my Order entered September 13, 1961, the case was reinstated. At the time, I believe counsel for the plaintiff was satisfied with the conditions of the reinstatement but that counsel for the defendant took exception thereto. In my Order I directed counsel to comply with pretrial Rule 5(II) of this Court so that pretrial procedure could be completed "with the understanding that the case will be set for trial commencing the week of January 29, 1962". The case did not come before me again until January 29, 1962, when the trial commenced pursuant to the Order of Judge Marsh entered January 4, 1962. It should be emphasized that in my Order of September 13, 1961, I did not direct that this case be pretried or tried by me but simply directed that it be placed upon the active trial calendar.

The foregoing is a summary of the record in the pretrial stage, which, says Mr. McArdle, was the result of a prejudicial attitude on the part of the Court. It should be noticed also at this point that Mr. McArdle had not yet personally participated in any of the pretrial procedures, including the hearing at the time the case was reinstated. Such then is the record which, says plaintiff's counsel, in Reason 1(a), was the result of a prejudicial attitude on my part. If the foregoing be accepted as showing prejudice, then any decision made by any Judge is subject to a similar attack.

Reasons 1(b), (c), (d), (e), (f) and (g) and Reason 10 may be classified as charging hostility towards the plaintiff and prejudicial conduct on the part of the trial court toward plaintiff and her counsel, which, in combination, resulted in an unfair trial. Several of these reasons will be separately commented upon. The other reasons will be covered in the general discussion of the first and tenth reason for a new trial.

As to Reason 1(c) in the motion, mentioned in VIII of plaintiff's brief, a situation is presented in which experienced counsel charges that the trial judge improperly restricted his cross-examination of defendant's witnesses. This allegation is based upon the rulings made at the time Mr. McArdle was cross-examining two witnesses for defendant, Robert Walker and James Miller. The record will show, however, that this allegation is in fact based upon rulings made at the time Mr. McArdle was examining but one witness for the defendant, to wit, one Robert Walker. This witness said that at the time of the plaintiff's fall, he estimated he was about eight feet away. Hearing a noise and hearing a thud "I turned to see what it was, and as I did, I seen this lady falling." He was "to the left of her and towards the back of the store." He testified that he went to her assistance, getting her a chair and asked her whether she was hurt and her reply was that she was not. He further stated that he did not see any string on her foot at any time. Some questions

were then asked by me and by Mr. Martin as to the witness's exact position, because it was not clear from the direct examination as to whether he was facing her or coming up behind her at the time plaintiff fell. Mr. McArdle (Transcript, p. 38) then commenced his cross-examination. He went into the witness's position at the time of the fall and continued his interrogation uninterrupted by anyone for some three and one-half pages of the record, until a point (Transcript, p. 42) when Mr. McArdle became interested in where the witness had been before he started back to the shoe department which was where he was going but in another aisle, when he observed plaintiff. The witness, in answer to Mr. McArdle's question, stated his purpose in leaving his department. Mr. McArdle then, commencing at p. 43 of the transcript, interrogated the witness about his right to okay checks for any department. After continuing with several questions along that line, I stated (Transcript, p. 43), "I don't want to shut off the cross-examination." I indicated reasons for my ruling. Mr. McArdle then made the statement, "Your Honor limits me on cross?" My reply to him is set forth at p. 44 of the transcript indicating that the subject matter was beyond cross-examination. The next point of objection by Mr. McArdle occurs at p. 46 of the transcript. The witness had answered in response to a question that there was nothing on the floor. Mr. McArdle then interrogated the witness whether he was in Court when the Answer of the J. C. Penney Company was read into the record. The witness stated that he was not. Mr. McArdle's objection at this point was that the Court prohibited him from cross-examining this witness as to the Answer to an Interrogatory made by the defendant corporation. The point was that the defendant, of course, had admitted that there was string in the vicinity of the wrapping counter. The witness had not seen any string on the floor. Mr. McArdle referred to the answer which the Court and the jury understood was different from the witness's testimony. I felt

then and still feel that the matter was a point for the jury, without requiring a witness who did not swear to the answer to comment upon an answer to an interrogatory made by his employer. This is the same situation as permitting one witness to comment on the truth or falsity of a statement made by another witness. The jury hears both statements and it is for the jury to decide the credibility of each answer. Mr. McArdle, on cross-examination of this witness, then continued for several more pages to a point at p. 50 where he interrogated the witness as to injuries suffered by the granddaughter of the plaintiff, an eleven year old girl at the time she received a minor injury when her grandmother toppled over her. The witness stated that he did not examine the clothing the girl wore and then he was asked by Mr. McArdle whether he knew the J. C. Penney Company had replaced the coat she had torn. Mr. Martin then interposed an objection and moved to withdraw a juror. I sustained the objection and instructed the jury to disregard it. Mr. McArdle then persisted in interrogating the little girl about her possible injuries. I felt that this was just as objectionable as the prior questions. Mr. McArdle then replied that he was testing the witness's recollection. Mr. McArdle then objected that the Court was limiting his cross-examination. At this point, it is to be observed that the interrogation which Mr. McArdle was pursuing was double-barreled. Certainly, he was testing the witness's recollection, which, of course, Mr. McArdle has a right to do, but over and above that, he was covering a subject highly prejudicial to defendant as it related to possible admission of liability because defendant had reimbursed the little girl for damage to her clothing and otherwise given her first aid. The ruling here was made after an objection, and it is believed to be a proper ruling.

Reason 1(d) requires separate comment. Mr. McArdle says that the trial court cross-examined plaintiff's witnesses in a hostile and prejudicial manner which placed each witness in an unfavorable

light before the jury. This Reason will be discussed with Reason 1(f) and Reason 10. In 1(f) it is charged that the Court disparaged plaintiff's case before the jury by the use of the word "malingering" and in Reason 10 Mr. McArdle charges a general prejudicial atmosphere towards plaintiff, her witnesses and counsel which resulted in an inadequate verdict.

These three reasons all relate to the issue of damages. Some idea of the damages claimed by plaintiff in this case can be taken from the items of special damage offered in evidence. Mr. McArdle, in his brief, has divided these into five categories. Under the first, plaintiff claims over $4,500.00 for past medical and hospital expenses, including supplies, travel to Cleveland and expenses to Miami in 1956 and expenses to Phoenix. The expenses to Miami in the sum of $648.77 and the expenses to Phoenix in the sum of $500.00 are for reasons of health. Under the second subdivision, plaintiff claimed living expenses in Arizona because of her health over and above what she would have spent had she resided in Pittsburgh at $200.00 per month and to the day of the trial in the sum of $11,437.98. Under the third category plaintiff claimed lost wages for seven years at approximately $150.00 per week, a total sum of $54,600.00. Under items 4 and 5, she claimed for past pain and suffering and for future medical expense, cost of living and trips home to see her family in unliquidated amounts. For impairment of earning power in the future and for future living expenses in Arizona, plaintiff claimed over $51,000.00, plus unliquidated amounts for future medical and pain and suffering.

Plaintiff, in appearance, might best be described as a short stout woman. As indicated, she had a lengthy medical history. Prior to trial she had, in fact, suffered three falls. The first one in 1949 was at her daughter's home. The second is the basis of this law suit. She suffered a third fall in Columbus in the year 1960 while in a cafeteria. Her witness, Dr. Harmeier, in describing the incident as related to him said, (Transcript, p. 146), " * * * she described that she got a message that she was going to fall, that she did fall."

The following is but a brief summary of her illnesses and disability which she claimed in this trial. From the hospital records which were testified to by her physicians it appeared that plaintiff suffered a fall at her daughter's home in 1949 at which time she suffered a fracture of her left big toe. (This was the apparent first result of the fall.) On November 13, 1949, she was admitted to the hospital for the removal of her gall bladder and she had an apparently satisfactory recovery. She had complained of constipation, gas, pain in the back, for the past seven months prior to the gall bladder operation. In January and February of 1951 she was admitted to the hospital for an amputation of the hammer toe on her right foot which was the direct result of the 1949 fall. At the same time she also had a fatty tumor removed from the right upper arm and a similar lesion from her left thigh. She was again admitted to the hospital on April 21, 1951 and remained until April 29, 1951, at which time she complained of pain in her left hip, which was attributed to the 1949 fall. This pain was found to consist of some spasm of the musculature with reference to the left hip, and at that time a small painful nodule over the lower lumbar vertebrae was removed and traction applied. She underwent a spinal fusion in the year 1953 as a direct result of her 1949 fall and was still under treatment for this spinal fusion at the time of the fall involved in this action. In March of 1954 she was once again admitted to the hospital complaining of pain on walking and at that time she had a bunion removed and also a keratoma, a small wart, was removed from her finger. She was described by Dr. King as having a postural deformity due to overweight consisting of lumbar lordosis which is characterized by a forward abdomen and curvature in the small of the back. Also, a dorsal kyphosis, more commonly described as hunch back. Dr.

King also stated that she suffered prior to 1955 from Hypertrophic Arthritis as well as Chronic Cystic Mastitis.

In her own testimony Mrs. Sleek verified the foregoing hospital records as to her injuries and illnesses and further stated that she was in the hospital after the fusion operation for about a month and in a back brace thereafter for a period of some 18 months. She stated that she had been out of the cast or brace for three months when she fell in the Penney Store. The claim in this case made by her and according to her counsel's theory supported by her physician's, was that in the fall in the Penney Store she suffered injuries as follows: She claimed injury to the cervical area of the spine with radiating pain onto the neck with severe headaches and down the neck and arm and into the legs with a numbness and tingling in her leg and a weakened right hand. Also, according to Dr. King, plaintiff had pain along the lateral or outside aspect of the right breast and intermittent periods of mental depression. Dr. King further stated that X-Rays taken in February, 1955, revealed some Arthritic changes in the cervical spine and some narrowing of the spaces between the vertebrae. He stated that she suffered a Hypertrophic Arthritis and that the fall in the Penney Store caused pain of the Chronic Cystic Mastitis, if the pain were not present before the fall. The Hypertrophic Arthritis was pre-existing and aggravated by the Penney Store fall and also the Chronic Cystic Mastitis was pre-existing. The pain and contusion of the cervical spine and of the right shoulder girdle was a direct result of the fall according to Dr. King. She also suffered a cardiac failure of Grade II which was diagnosed as nothing more that shortness of breath on physical exertion, according to Dr. King.

Generally speaking, the foregoing represents a summary of her disabilities for which she claimed damages but is not intended as a detailed statement of all that she and her witnesses stated as to her disabilities. At the time of trial plaintiff was suffering from Hepatitis. This will be the subject of discussion under Reasons 3 and 4.

■■ It was in the setting of the foregoing complex medical history and disability that as trial judge I felt that the situation permitted several questions by me to medical witnesses in an attempt to clarify matters which were unclear to me and perhaps to the jury. As I saw it, the jury had a most difficult task confronting it with respect to what disabilities suffered by plaintiff during the several years after her Penney fall were in fact the result of the fall or the result of a general illness or the prior fall or perhaps the fall suffered at Columbus, Ohio. Plaintiff was claiming over $100,-000.00 in special damages, all attributed solely to the Penney fall. She was claiming thousands of dollars in damages for living in Arizona rather than Pittsburgh because of her injuries suffered in the Penney Store. Yet the record indicated that she was only temporarily in Pittsburgh at the time of the Penney fall, since, in 1951 she had been advised by her Doctors to spend her time in warmer climates. A study of the record on this phase of the case makes it apparent that Mr. McArdle was confronted with an almost super human task in attempting to convince the jury that all Mrs. Sleek's troubles after 1955 should be compensated for by the defendant in this case. It is true that I mentioned the word "malingering" in asking several questions of medical witnesses. The medical report had indicated that there was no malingering. Mr. Martin had the same report, of course, and had spent considerable time skirting the subject. He left it unclear and uncertain as to whether Dr. Wycoff held the opinion that plaintiff was not malingering. As the trial judge, I thought it should be made clear to the jury, the Doctor's opinion on the subject. He gave his opinion in the negative so that the answer which was brought out was helpful, if anything, to the plaintiff. The Court believes the record speaks for itself as to the absence of any basis for the charges made by plaintiff in Reasons 1(d), (f) and Reason 10.

In Reason 1(g) Mr. McArdle complains that the Court failed to enforce its pretrial rules when it did not require defendant to file a narrative statement, disclose names of witnesses and furnish medical reports of examining doctors, all of which prejudiced the plaintiff's action. If such a charge were made by inexperienced counsel in another case, perhaps it would create an inference of unfairness. But for Mr. McArdle to make it in this case at the time he now does seems unfair to the Court. This Court did, in its Order of September 13, 1961, direct that both sides comply with Rule 5(II). I confess that I did not make a day to day or month to month examination of the Clerk's records to determine whether they had complied. In our Court the practice is for the opposing counsel to inform the Court of non-compliance by motion or otherwise before or during the pretrial conference. Certainly such a motion was not filed by Mr. McArdle. In due course this civil action was assigned to Judge Marsh for pretrial conference and he scheduled it for January 11, 1962. Shortly before the conference Mr. McArdle, from Mexico, caused a letter to be written to Judge Marsh which is the basis for Judge Marsh's Order entered January 4, 1962. Mr. McArdle's letter dated December 29, 1961, informs Judge Marsh of his whereabouts; that the stipulation of facts is due to be filed December 31, 1961, and that the pretrial is scheduled before Judge Marsh on January 11, 1962. The letter indicates that Mr. McArdle is endeavoring to " * * * unravel the skein of medical evidence * * * " while in the southwest. He says he may require an amendment to the pretrial statement. He says he seeks the favor from Judge Marsh of postponing the conference and filing the stipulation of facts a few weeks after " * * * my return to Pittsburgh." He says Bruce Martin has no objection. He further states that his client is insistent on immediate disposition of the case. He says he is in accord and that as soon as " * * * these details are cleared the plaintiff will press for trial during the coming term." He then says, "We would be willing to agree, after the medical situation has been cleared up, to go to trial subject to defense counsel's calendar and agreement the day following the pretrial conference." Judge Marsh thereupon noted in his January 4, 1962 Order that the time for discovery had long since expired. He dispensed with the pretrial conference scheduled before him on January 11, 1962 and directed that the Clerk place this civil case on the active trial calendar for trial " * * * commencing the week of January 29, 1962 before the Honorable Joseph P. Willson." The point is that a pretrial conference to iron out any discovery or failure to file any pretrial statements was scheduled and Mr. McArdle had it postponed. It is fair to assume from his letter that Judge Marsh assumed that he would be ready for trial at the coming term and had so ordered the case set down for trial on the current calendar. Judge Marsh apparently concluded that a pretrial conference was unnecessary under the circumstances. No pretrial conference was thereafter requested by Mr. McArdle. He, of course, had known for a long period that his client had been examined by defendant's physician, Dr. Carpenter and he tells the Court that he asked Mr. Martin for a copy of the report but did not get it. He, of all counsel practicing in this Court, knew how to get a copy of the report. He filed no motion. During the trial and later in his case he brought out on the record that his client had been examined by Dr. Carpenter (Transcript, pp. 302, 303). The subject had been previously discussed at side bar at page 272 and Mr. McArdle was informed that had he asked for the report earlier, Mr. Martin certainly would have been directed to give it to him. He then for the first time made a request to the Court that defendant's counsel produce a copy of the report. Our Rule 5(II) provides that a physician's report be attached to pretrial narrative statements and I am frank to state that it should have been attached to defendant's statement, but the defendant filed no such statement and the Court did

not know it until it was called to his attention during the trial. At that time Mr. McArdle's request was for a discovery purpose. He so stated it at oral argument in that he said that if it had turned out to be favorable to plaintiff, *he might have wanted to call Dr. Carpenter as his own witness.* However, when the subject came up during trial and Mr. Martin stated to me that he did not intend to call Dr. Carpenter, I denied the motion for the production of the report as I felt it was untimely. Under the circumstances, I believe there is no error in the ruling. It is this ruling, among others, that is used as the basis of the charge of prejudice on the part of the trial judge.

It is believed that the remaining reasons relate to trial errors, aside from the charge of prejudice, except that counsel says that the prejudicial atmosphere of the trial and the hostility of the trial court toward plaintiff's action, witnesses and counsel resulted in an inadequate verdict. This is an interesting speculation on the part of Mr. McArdle. My view is that Mr. McArdle, from the outset, was worried about the possibility of an adverse verdict, and if he got a verdict from the jury, that it might be rather moderate in size. It was apparent to Mr. McArdle that he would have difficulty convincing the jury that plaintiff's injuries suffered in the fall could be separated and distinguished from her other disabilities. He knew, of course, that Mr. Martin would attempt to show that such division and separation of plaintiff's disability was, under the defense theory, impossible. It is to be remembered that plaintiff, just prior to her fall, was standing still on a level floor examining a sales record. On her first step her foot became engaged in or on something. She stumbled for several steps and fell to the floor. Her granddaughter, attempting to stay her fall in some manner, went down with her. The point is that, under a generous view of the testimony, plaintiff did not suffer a violent crashing blow or injury. In fact, according to one witness, she said she was not hurt. It was

at a later time she commenced to suffer from an injury which was attributed to the fall. As the trial progressed, it was apparent to any experienced observer that Mr. McArdle was having a difficult time "selling his case" to the jury. It was in this trial atmosphere that plaintiff's counsel was apprehensive that the jury was not accepting not only plaintiff's theory of negligence, but her claim for damages also. Before and during the trial, I sought to have counsel compromise the case. It seemed that in view of past history, a settlement was in order. Mr. Martin had indicated that his client insurance carrier had offered plaintiff $15,-000.00 before he ever got into the case. He had no other figure and did not even suggest that he would pay that sum because Mr. McArdle would not discuss any sum less than $50,000.00. At the oral argument on the new trial motion Mr. McArdle's position was still the same. He told the jury that it was a "big" case. However, apparently the jury took a different view as to plaintiff's damages. What has been said has largely been devoted to the allegation of prejudicial conduct of the trial court, Reasons 1 and 10 of the motion.

Reason 2 alleges that the Court erred in permitting the introduction into evidence by defendant of a medical report of a physician who was not available to plaintiff for cross-examination. Reason 11 is on the same subject matter. This matter came up during the cross-examination of plaintiff's physician Dr. Wycoff. He had testified for plaintiff at considerable length. On cross-examination, he was asked by Mr. Martin whether or not he had not referred plaintiff to a colleague, Dr. Rowe, for an examination and report. He said that he had. He stated that he had the report and Mr. Martin asked him to read it. This was without objection by Mr. McArdle. Mr. McArdle now complains and did during the trial at several points that Mr. Martin was cross-examining Dr. Wycoff on Dr. Rowe's report to him. The record will show that I sustained Mr. McArdle's objections when they were made on this subject, but

the report had been read by Dr. Wycoff as soon as the cross-examination commenced and without Mr. McArdle's objection. There is some confusion in the record (Transcript, pp. 265–270) as to what exactly Mr. McArdle is objecting to and perhaps what the court was ruling on. Nevertheless, at side bar and in open court, I ruled on the situation as it then appeared, that is that Mr. Martin could not cross-examine Dr. Wycoff in a piecemeal fashion on the contents of the report; that the report was not made for the purpose of offering it as independent evidence by defendant, but used in cross-examining Dr. Wycoff who in turn had used it in making up his own opinion on Mrs. Sleek's physical condition. I think the jury understood the situation clearly, and that if any error occurred, it was harmless and made in the midst of a hard fought trial when the Court was required to rule on a rather complicated subject.

 Reasons 3 and 4 relate to what counsel characterizes as the difference in the Federal and Pennsylvania burden of proof, and specifically, says Mr. McArdle, the Court erred in refusing to apply the so-called Federal standard in this, a diversity case, and in excluding plaintiff's proof as to the causal connection " * * of plaintiff's liver condition with the trauma and its results." In short, it came out during the testimony that plaintiff is now suffering from Hepatitis. This was a subject which Mr. McArdle alluded to in his letter to Judge Marsh. He mentioned it in chambers before the start of the trial. I think, as trial judge, I carefully pointed out to him that as soon as any Doctor was able to say that there was a causal relation between the Hepatitis and the trauma, it would be admitted. This subject was discussed several times and is in the record generally at side bar. Mr. McArdle referred to Dill v. Scuka, 279 F.2d 145 (3 C.C.A., 1960), on this subject and other federal cases, none of which ruled that precatory words by a Doctor are sufficient to tie in a disease such as Hepatitis with a trauma. Dr. Tuchler (Transcript, p.

202) discussed Hepatitis as an infection or inflammation of the liver. He said Hepatitis is broken into two kinds, A and B. Both of them are virus. "One is transmitted by food, by stool, by bug, that is in something we eat and maybe even infectious in the atmosphere. We have no control." He further said, "The other virus hepatitis just has to be injected into the body by some syringe or needle." Mr. McArdle was interested in and sought to show that perhaps plaintiff's Hepatitis resulted from a reaction to a drug. As to the Court's error, it must be noted that Dr. Harmeier, the first witness who used precatory words did not even know the origin of Hepatitis. I think the record supports the Court's ruling that this witness disqualified himself on any score, and had agreed that he had, from testifying that Hepatitis was related to plaintiff's trauma. On page 206 Dr. Tuchler stated categorically that based on reasonable medical certainty he could not tie in the Hepatitis with the fall. In the Dill case, in speaking of the burden of proof, p. 147, the Court, Judge Staley writing, stated with relation to expert witness's that " * * * the federal rule as to the sufficiency of the evidence would be exactly the same as the Pennsylvania rule." In 1954 the now Chief Justice of Pennsylvania, in Wargo v. Pittsburgh Railways Co., 376 Pa. 168, at page 173, 101 A.2d 638, 640 (1954), quoted from Vorbnoff v. Mesta Machine Co., 286 Pa. 199, 206, 133 A. 256, with approval. In speaking of physicians, the Court said:

"The witness would have to testify, *not that the condition of claimant might have, or even probably did, come from the accident, but that 'in his professional opinion the result in question came from the cause* alleged'; for, according to our latest pronouncement on this subject, a less direct expression of opinion would fall below the required standard of proof, and therefore would not constitute legally competent evidence."

Under the evidence of the physicians in the instant case, I do not think that any

issue whatsoever is presented as their testimony simply failed altogether in showing any relationship between the Penney Store fall and plaintiff's Hepatitis.

Reasons 5 and 6 relate to plaintiff's cost of food in Arizona and to limiting plaintiff's proof of damage to increased cost of living only. These matters are mentioned at considerable length in the trial record beginning at p. 304. The record indicates that Mr. McArdle was in some confusion in presenting this evidence as to exactly what exhibits showed what expenses. The exhibits were marked, portions crossed out and corrected. Mistakes were made and corrected as to expenses covering food. It is a bit difficult to determine just exactly what is now complained of. But in the charge to the jury, which is not excepted to, the jury was carefully instructed on this subject and I believe correctly instructed, (Transcript, pp. 333, 334).

In Reason 7 plaintiff says the Court erred in refusing plaintiff's points for charge Nos. 1, 2, 4 and 5. The error charged here as it relates to Reasons 1, 2 and 4 is believed insubstantial. These points referred to the substantive law on the duty of a landowner storekeeper with regard to an invitee coming on his premises. The landowner's duties were fully set forth in the charge and the substance of which was requested was included in the charge. Point No. 5 is in a different category. It reads as follows:

"5. The defendant has introduced evidence which asserts that the accident was caused when the woman plaintiff stumbled over a platform paralleling the isle and which extended 5 inches above the floor. Under all the evidence, the jury may consider the existence of a 5 inch platform forming part of the intersection of isles to be in itself a violation of the duty owned by Penney to Sleek. Such 5 inch platform, termed a 'lowboy', was a substantially contributory cause to the accident."

Reason No. 8 in plaintiff's motion for a new trial is on this same subject matter. The first three lines of the point 5 request for charge, as a statement of what defendant introduced into evidence is misleading and is incorrect. Plaintiff cites Federal Civil Rule 15(b) which, of course, authorizes an amendment to a pleading at any stage to conform to the evidence, that is, of course, when issues not raised by the pleadings are tried by express or implied consent of the parties. This brings clearly into focus Mr. McArdle's contention that under the evidence the lowboy may have caused plaintiff's fall, but the statement in his brief as to what the defense witnesses said on the subject is inaccurate. He says in his brief, p. 4, "The defense witnesses, Mrs. Olsen, Mr. Walker and Mr. Miller, stated that other people had, or could have, stumbled into this 'lowboy' and that it would be difficult to see the corner of it unless you were looking directly down upon it." I have carefully examined the testimony and find that no witness stated that anyone had ever stumbled. Only one witness, Mr. Walker, when testifying on the subject concluded that there was a possibility that someone might have but he did not know that anyone had ever stumbled over the lowboy. The only evidence on this subject came out on cross-examination of Mr. Walker by Mr. McArdle. He got the witness to speculate and to arrive at conclusions. The point to emphasize is that there is nothing in this record with regard to the lowboy except pure speculation. There was no issue tried by express or implied consent as contemplated in Rule 15. There is simply no evidence to take to the jury on this point. Yet Mr. McArdle prepared and submitted a point for charge absolutely unsupported by any evidence. I have carefully reviewed the whole incident and believe that the refusal of request No. 5 was correct and that there was no error as claimed in Reason 8 of the motion.

Reason 9—The verdict was grossly inadequate. Contrary to Mr. McArdle and his client, this Court believes

that the verdict was well within the evidence on the issue of plaintiff's damages. Her long history of illness and disability has been reviewed to some extent. At the time she fell, on January 5, 1955, she was still being treated for the spine injury which resulted from the fall at her daughter's home in October of 1949. She had resided in Florida, California and Arizona for various periods of time prior to the fall involved in this case, but her expense and continued residence in Arizona she attributed to her injuries received in the instant fall.

Defendant offered no testimony on damages. His only witnesses were the three witnesses on liability. There are cases and this is one of them when in the course of the trial it becomes apparent that the evidence produced by one side or the other is not going over with the jury. This is often characterized as the "feel of the case". As trial judge, as this trial progressed, it seemed apparent that this jury, from the outset, was not accepting plaintiff's theory of the case and her evidence in a light favorable to her. This was the feeling I had as trial judge. I am confident that Mr. McArdle had the same feeling. He possesses a most engaging personality and knows how to turn on his charm to make the most of his ability. He did that in this case. Mr. Martin, for defendant, sat back and by masterly cross-examination discredited plaintiff's claim for big damages. It is too bad the record of the summations of counsel have not been transcribed. If it were written up it would show more than an hour's address by Mr. McArdle with a peroration in which he complimented the court for the way in which the case was tried, he complimented Mr. Martin on his great war record and on his ability as a defense counsel. In other words, he pulled out all the stops so to speak in a final attempt to put over his client's cause. It seemed to the court that the case was touch and go as to whether plaintiff would receive a verdict, let alone any damages. It is, of course, apparent that the size of the verdict, considering the money verdicts in negligence cases in this day and age in this court, is moderate in size. Yet we often have them where much larger verdicts are expected. I think the verdict was adequate under all the evidence and considering the difficulty that the jury had in analyzing and weighing the evidence on damages.

As I am required to do, I have carefully examined the record as to the weight of the evidence. As indicated, a factual jury question was presented. The jury's decision as to the size of the verdict is well within all of the evidence. The motion for new trial will be denied.

## II—DEFENDANT'S MOTION FOR JUDGMENT N. O. V.

Because of the charge of prejudice made against the trial judge, I felt that it was necessary first to review the trial record on all aspects of the motion for new trial before reaching the motion for judgment N.O.V. which was first filed. The reason, of course, is that if the trial was tainted with prejudice on my part towards plaintiff or her counsel then plaintiff should be given another opportunity to present her case regardless of the N.O.V. motion. Having decided this question against plaintiff, defendant's motion is now considered.

In passing upon this motion, the Court has in mind the well settled rule that the evidence is to be viewed and all reasonable inferences arising therefrom in the light most favorable to the plaintiff. I am bound to take the view of the evidence which most favors the plaintiff. Magee v. General Motors Corp., 213 F.2d 899, (3 C.C.A.1954); Zegan v. Central Railroad Company of New Jersey, 266 F.2d 101, 77 A.L.R.2d 768 (3 C.C.A., 1959).

Mr. Martin contends, of course, that the evidence does not support a finding that the plaintiff was caused to fall by the string. He concedes, of course, as he must, that if there was sufficient evidence to support the finding implied in the jury's verdict, that the string caused the fall, the verdict and judgment are unassailable. Mr. Martin quotes a part of the charge where it was stated:

(Transcript, p. 324) "Was there a string on the floor and whether such was negligence and whether that negligence caused the injury." He concedes now that there was string on the floor and that that was negligence in the abstract, but, says defendant, plaintiff never got beyond guess and conjecture in attempting to produce evidence that the abstractly negligent string was the proximate cause of her injury. Plaintiff, by counsel, in the opening and in her testimony presented the issue as to whether the string became entangled in her foot causing her to fall. She had been standing still, looking over a sales slip. She commenced to walk. She said (Transcript, p. 276) "My right foot was caught. I did not know by what, simply was going back and forth. I couldn't fall. I couldn't straighten. Finally, I fell." At one point plaintiff said that what her foot was caught in felt like a "band of steel".

Plaintiff's counsel relied on Clark v. Glosser Bros. Dept. Stores, Inc., 156 Pa. Super. 193, 39 A.2d 733, (1944) as the authority for plaintiff's theory of liability. In that case packages were held together by tapes. When the packages were broken, the tapes, some of which were tied at the end forming loops, were either thrown or fell to the floor. Plaintiff stepped upon some of the tapes, tripped and fell to the floor, sustaining injuries. In the decision it is stated that plaintiff could give no further information than that she stumbled and something "got tangled in my foot". In the instant case, it is conceded that string was on the floor near where plaintiff was standing. For the defendant, Mr. Martin strongly contends that to permit the verdict to stand is to permit it to rest upon speculation and surmise only. He cites several well known Pennsylvania decisions such as Radies et vir v. Reading L. G. S. & S. Soc., 197 Pa.Super. 509, 178 A.2d 789 (1962); Rinaldi v. Levine, 406 Pa. 74, 176 A.2d 623 (1962); Hillelson v. Renner, 183 Pa.Super. 148, 130 A.2d 212 (1957); Sloss v. Greenberger, 396 Pa. 353, 152 A.2d 910, (1959); Hopkins v. Williamsport, 25 Pa.Super. 498,

(1904); Knepper v. Tamaqua Borough, 36 Pa.Super. 183 (1908). Mr. Martin contends that the concept of wrapping strings feeling like a band of steel and immobilizing plaintiff, if not impossible, is, at best, no more than a mere guess.

However, this case differs in many respects from the situation presented in the cases cited by defendant. As in the Clark case, the string on the floor came from defendant's activities. The jury could start out with the proposition that the string on the floor was put there by the defendant. It seems to the Court that it was for the jury to say whether the inability of plaintiff to take a step came from something wrapped around or entangled in her foot. She was in an aisle. Her position certainly precluded any consideration of the lowboy contention, that is, that she was up against a counter and could not take a step for that reason. It did appear to the Court with some basis of fact to rely on, that in the knowledge and experience of the jury, it could base its conclusion on liability on the evidence that the string caused the fall and that its location there at that time was negligence. I believe that this was carefully explained to the jury in the charge, and, therefore, the verdict should stand.

I think the rule stated in the recent case, Riesberg v. Pittsburgh & L. E. Railroad, 407 Pa. 434, 445, 180 A.2d 575, 581 (1962) is to be applied in the instant case. The Court said:

"* * * this Court, speaking through Mr. Justice McBride, stated: 'We have said many times that the jury may not be permitted to reach its verdict merely on the basis of speculation or conjecture, but that there must be evidence upon which logically its conclusion may be based. (citing cases). Clearly this does not mean that the jury may not draw inferences based upon all the evidence and the juror's own knowledge and experiences, for that is, of course, the very heart of the jury's function. It means only that the evidence presented must be such

that by reasoning from it, without resort to prejudice or guess, a jury can reach the conclusion sought by plaintiff, and not that the conclusions must be the *only* one which logically can be reached. * * * It is not necessary, under Pennsylvania law, that every fact or circumstance point unerringly to liability; it is enough that there be sufficient facts for the jury to say reasonably that the preponderance favors liability. * * * The facts are for the jury in any case whether based upon direct or circumstantial evidence where a reasonable conclusion can be arrived at which would place liability on the defendant.' "

Defendant's motion to set aside the verdict and the judgment entered thereon and to enter judgment for the defendant will be denied.