PIERKOWSKIE et al. v. NEW YORK LIFE INS. CO.

No. 8471.

Circuit Court of Appeals, Third Circuit.

Argued Feb. 25, 1944.

Decided Dec. 1, 1944.

As Amended March 7, 1945.

---

Douglass D. Storey, of Harrisburg, Pa. (Chas. E. Berger, of Pottsville, Pa., Ferdinand H. Pease, Gen. Counsel, of New York City, and Storey & Bailey, of Harrisburg, Pa., on the brief), for appellant.

Alexander N. Rubin, of Philadelphia, Pa. (Roy P. Hicks, of Pottsville, Pa., Hirschwald, Goff & Rubin, of Philadelphia, Pa., and Hicks & Watkins, of Pottsville, Pa., on the brief), for appellees.

Before BIGGS, JONES, and GOODRICH, Circuit Judges.

BIGGS, Circuit Judge.

The plaintiffs, beneficiaries of a life insurance policy, sued the defendant to recover under the double indemnity provisions of the policy. The beneficiaries recovered a judgment for the full amount sought. The defendant has appealed and the substance of its objection to the judgment lies in its assertion that the District Judge adopted an attitude deliberately inimical to the defendant and constituted himself an advocate for the plaintiff. Other grounds of error are alleged which will be discussed in this opinion, but the serious charge laid against the District Court will occupy most of our attention. In order that the circumstances of the case may be clear, it is necessary that this opinion contain a more detailed statement of facts than ordinarily would be warranted.

On June 24, 1927, Joseph Pierkowskie, Sr. bought a life insurance policy from the defendant which provided that double indemnity should " * * * be payable upon proof that the death of the Insured resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental means and occurred [sic] within ninety days after such injury." On July 4, 1940, at about nine o'clock in the evening, the insured, then sixty-six years old was struck by an automobile while crossing the street in front of his home. He was thrown about as high as the top of the car which struck him. Within a short time after the accident Pierkowskie was examined by Dr. Leo E. Pulaski, who had attended Pierkowskie from time to time from 1935 or 1936. Dr. Pulaski testified that Pierkowskie had sustained contusions of the head and scalp, bruises and a simple fracture of the bones of the right leg. Immediately after this examination Pierkowskie was taken to a hospital. He remained there for about three weeks and then was sent to his home. The fracture of the bones of his leg did not knit at that time. After returning home, Pierkowskie never left his bed. He developed hypostatic pneumonia and died on August 29, 1940.[1] So much for the accident and the circumstances immediately surrounding the death of the insured. It is necessary now to turn to circumstances antedating Pierkowskie's death by about eight years.

In 1932, the insurance company commenced to make payments to Pierkowskie for total disability under the terms of the policy here sued upon. These payments continued until his death. In May, 1932, Pierkowskie was examined by his physician, Dr. William T. Leach, in aid of Pierkowskie's application for disability benefits. Dr. Leach testified at the trial that it was his opinion at the time of the examination that the insured would be "permanently, continuously and wholly prevented from working for the rest of his life". This physician testified further that in 1932 he had deemed Pierkowskie's life expectancy to be short. The examination disclosed four plus albumin in the urine, nephritis, marked edema of feet and legs and some ascites. In 1933, Dr. Leach again examined Pierkowskie and found that he had diseases of both heart and kidneys. On February 27, 1934, Pierkowskie was examined for the insurance company by Dr. E. J. Cook. Pierkowskie was at home and in bed at the time of this examination. Dr. Cook found a definite enlargement of Pierkowskie's heart, signs of decompensation, epigastric tenderness, marked secondary anemia, shortness of breath and swollen feet. In 1935 Pierkowskie was again examined by Dr. Leach. In this examination Dr. Leach found that Pierkowskie was suffering from cardiorenal disease and from nephritis. On May 25, 1935, Dr. Roland C. Moyer made a complete physical examination of Pierkowskie for the insurance company. This examination, Dr. Moyer testified, disclosed chronic myocarditis and neurasthenia. None the less the physician predicted an improvement in the insured's condition. Dr.

---

[1] Within ninety days after the accident.

Leach made another examination of Pierkowskie in 1936 and again found him to be suffering from heart and kidney diseases. He certified again to the insured's continued permanent disability. On April 24, 1937, Dr. Moyer again examined Pierkowskie and found him suffering from cardiac decompensation, edema of both feet and nephritis. An urinalysis taken at this time was positive as to albumin. Dr. Moyer testified that Pierkowskie was so weak that the doctor was afraid Pierkowskie would die in his office.

In 1937, certain members of Pierkowskie's family filed a petition in the Court of Common Pleas of Schuylkill County to have the insured declared to be mentally incompetent and to have a guardian appointed for him and his property. Dr. Pulaski and Dr. John Conway testified for the petitioners at the hearing before the Court of Common Pleas. Their testimony in the case at bar as to the nature and extent of their evidence before the Pennsylvania court is vague and unsatisfactory. Dr. Pulaski stated that he had not kept any records as to Pierkowskie because "it wasn't a serious case. * * *" He thought that he had treated Pierkowskie from 1935 or 1936 until his death. He stated that at the time he made his first examination of Pierkowskie he found a mild form of myocarditis and moderate hypertension. Dr. Conway made no examination of Pierkowskie but simply accepted Dr. Pulaski's findings.

In 1937 Pierkowskie fell down the steps of his home and was taken to a hospital after this accident. The testimony concerning this accident and the decedent's condition following it is so incomplete that there would be no point in repeating it here except to state that his hospital record as of that time showed a diseased heart.

Dr. Moyer again examined Pierkowskie for the insurance company on May 21, 1940. Dr. Moyer testified that at this time he was scarcely able to walk and was very short of breath. Both of his legs were swollen and his heart was in a bad condition.

The foregoing is a synopsis of the testimony in respect to Pierkowskie's physical condition prior to the evening on which he was struck by the automobile.

As has been stated, Dr. Pulaski examined Pierkowskie immediately after he had been struck by the automobile and sent him to the hospital but Dr. Pulaski did not treat him while he was in the institution. He did call upon Pierkowskie from time to time while the insured was there. Pierkowskie was then under the direct care of Dr. John Burke, the hospital's assistant surgeon. Dr. Burke performed his service under the supervision of Dr. Leach, hereinbefore referred to. When the insured was brought to the hospital on the night of July 4, Dr. Burke found that he had sustained lacerations of the scalp, contusions of the legs and the fracture of a leg. He found also that Pierkowskie had marked edema from toes to waist. Dr. Burke found also that Pierkowskie was suffering from a very serious heart condition. The edema decreased considerably while Pierkowskie was in the hospital as was to be expected since he was either in bed or in a wheel chair. Dr. Burke testified that the edema could not have been caused by the accident. He did not treat or see the insured after he left the hospital. Dr. Burke testified that in his opinion Pierkowskie's death resulted directly or indirectly from the "illness or diseases" prior to his discharge from the hospital. In filling out the death certificate required by the insurance company, however, Dr. Burke answered the question, "What disease was the immediate cause of death?" as follows: "Laceration of scalp, fracture of right leg, tibia and fibula." In response to the question "From what other important diseases, if any, did deceased suffer?", Dr. Burke wrote "Myocardial decompensation".

Dr. Pulaski treated Pierkowskie from the time he left the hospital until his death. Following his return from the hospital on July 25, Pierkowskie developed a headache and an ear abscess. According to Dr. Pulaski, Pierkowskie's myocarditis showed no important change. The insured developed an edema of the scrotum and hypostatic pneumonia three or four days before his death. Dr. Pulaski testified that the pneumonia was due to the fact that Pierkowskie was in bed and that hypostatic pneumonia was a complication to be expected under such circumstances. He testified that Pierkowskie's death "* * * was due to an injury, a fracture of the right tibia and right fibula and hypostatic pneumonia." Dr. Pulaski was asked, "Was there a direct relationship between the hypostatic pneumonia that developed and the fracture that you have described?" He answered that, "* * * the hypostatic pneumonia was the result of the

fracture." He testified also that Pierkowskie's prior infirmities had nothing to do with his death.

In addition to this medical testimony, Dr. Lester L. Bower, a gastroenterologist called by the defendant, testified that in his opinion the cause of Pierkowskie's death was his prior illness. Dr. Bower had not examined Pierkowskie.

Pierkowskie's son and daughter both testified that their father had not been gainfully employed for some time prior to 1932, but that until the accident of July 4, 1940, he had been able to perform small tasks about the house.

█ What law is controlling as to substantive rights in the instant case? In New York Life Ins. Co. v. Levine, 3 Cir., 138 F.2d 286, 288, this court, by Judge Maris, stated, "Under the Pennsylvania conflict of laws rule the interpretation of a contract is determined by the law of the place of contracting. In Pennsylvania it is held that the place of contracting in the case of an insurance contract is the place where the policy was delivered. In the absence of proof as to where the policies were delivered it is presumed that delivery took place at the insured's residence. Since the insured was a resident of Pennsylvania the courts of that state would apply Pennsylvania law in interpreting the policies." Accordingly, since the record in the instant case is devoid of evidence as to where the policy was delivered and Pierkowskie was a resident of Pennsylvania, we will apply the Pennsylvania law.

█ Under that law the beneficiary of an insurance policy containing double indemnity provisions similar to those at bar must prove not only that the insured's death was caused by external and accidental means but must also exclude all other causes. Real Estate Trust Company v. Metropolitan Life Insurance Co., 340 Pa. 533, 17 A.2d 416; Johnson v. Kentucky Central Life & Accident Insurance Company, 144 Pa.Super.Ct. 116, 18 A.2d 507.

We will deal now with the very serious charge made by the defendant in respect to the conduct and attitude of the District Judge. The defendant contends that the court's attitude and actions toward Dr. Bower and other medical witnesses offered by the defendant and toward their testimony constituted prejudicial error. It asserts also that this bias or advocacy in favor of the plaintiff was continued by the District Judge in his charge, in particular because he emphasized the importance of Dr. Pulaski's testimony which was favorable to the plaintiff and minimized or belittled the testimony of the defendant's medical witnesses. The defendant takes the position that this attitude of the District Judge commenced, if indeed it did not begin before, with a hypothetical question asked of Dr. Bower as to his opinion of the cause of Pierkowskie's death. The hypothetical question, as hypothetical questions go, was not a long one, covering about two pages of the printed appendix. As soon as it had been completed the plaintiffs' counsel objected to it on the grounds that a "hypothetical question of this kind can only be put to a witness who is qualified * * * and if it includes all the facts in the record." The plaintiffs' counsel went on to say, "The facts that my friend has presented to this physician are only those facts which have been produced as favorable to his position. It does not include anything that Dr. Pulaski testified to. It does not include the facts in relation to the accident. It does not include the parts of the reports that were filed by the physicians who were sent to this man by the New York Life Insurance Company, which negatives some of these conditions. In other words, we have only selected portions of the record that have been submitted to this doctor and under all the cases that is certainly an improper question."

The counsel for the defendant stated in reply: "I have not selected portions of any reports. I have taken the fundamentals of all the reports that were furnished and I have not just selected the favorable things. I have based this entire——" The court interrupted him at this point and said, "In the first place, you have not taken into consideration the testimony of the doctors who said [that] at the time * * * [Pierkowskie] left the hospital he required no treatment for his heart and he needed no medication. Is that the basis on which this doctor is to give a professional opinion?" The defendant's attorney replied, "I think this is a perfect basis for his opinion." The trial judge then asked, "Is it not requisite that he have all of the facts, not alone those that are favorable?" The defendant's counsel answered, "I will say to your Honor that it is manifestly almost impossible in framing a hypothetical question * * * to

embody every element in the question that the other side thinks ought to have been embodied into it, but it can be brought out and ought to be brought out on cross-examination." He stated also that a hypothetical question addressed to an expert witness should be answered despite the fact that it did not embody every fact in the case.

The District Judge replied, "Of course, that is true that every element certainly cannot be given in a hypothetical question, but my recollection is that it most certainly must be a fair consideration of the record. Let me say that I do not think you have qualified this doctor to testify to heart conditions. I am only a layman, but his specialty is the stomach and intestinal tract. There is nothing in this record which qualifies him preliminarily. I think he cannot testify. What is there in being a stomach and intestinal tract specialist which qualifies him in any degree as a heart specialist?" Further colloquy took place between court and counsel. The court at one point stated: "My objection is that they [the conditions stated in the hypothetical question] are only favorable conditions [to the defendant] in respect to the record and the witness has not before him a fundamental conception of the problem we have here to consider." At a later point the trial judge directed this question to the defendant's counsel: "You mean * * * that in forming a hypothetical question presented to a witness for his professional opinion you can only select those facts pertinent to your side of the case and favorable to your side?" The discussion between the court and counsel on this point went on for some time but repetition in this opinion of the exact words used would not be helpful. At the end of the argument Dr. Bower was qualified further and was permitted to answer and did in fact answer the very question which the defendant's attorney had propounded.[2] The jury was present throughout the discussion.

The fact that the hypothetical question asked by the defendant's counsel was answered by Dr. Bower might seem to preclude the necessity of determining whether it was a proper question. Since we must deal with the fairness of the attitude of the District Judge toward Dr. Bower and his testimony, the propriety of the form

and substance of the question does become pertinent. The defendant takes the position that it had the right to ask the question as it was phrased; that the law permitted such a course and that the remarks made by the District Judge prejudiced its cause in the minds of the jurors. In its brief the defendant states, "It is clear that the objections of counsel for Plaintiffs and of the Trial Judge [to the question] were without the slightest merit.", citing Gillman v. Media, Middletown, etc. Electric Railway Company, 224 Pa. 267, 73 A. 342.

■■■ The defendant has mistaken the law. The provisions of Rule 43(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, state, "All evidence shall be admitted which is admissible under the statutes of the United States, or under the rules of evidence heretofore applied in the courts of the United States on the hearing of suits in equity, or under the rules of evidence applied in the courts of general jurisdiction of the state in which the United States court is held. In any case, the statute or rule which favors the reception of the evidence governs and the evidence shall be presented according to the most convenient method prescribed in any of the statutes or rules to which reference is herein made." The Federal Rules of Civil Procedure are to be construed liberally. Rule 43(a) is designed to favor "the reception of the evidence"; that is to say, all of the evidence which properly may be introduced in respect to the point in controversy. In the case at bar the issue was the cause of Pierkowskie's death. Treating the hypothetical question as being subject to the provisions of Rule 43(a), since it was designed to elicit an answer intended to be evidentiary, we conclude that under the applicable federal decisions the District Judge had the duty to cause the question to be so modified that the answer to it would prove helpful to the jury in determining the issue presented. We entertain no doubt that under the federal law of evidence that the trial judge possesses the power and the duty to compel an hypothetical question to be so framed that when answered it will not result in presenting an unfair picture to the jury. In New York Life Ins. Co. v. Doerksen, 10 Cir., 75 F.2d 96, 102, the Circuit Court of Appeals for the Tenth Circuit said, "A

---

[2] The statement in the appellees' brief that "Subsequently, the defendant supplemented the hypothetical question, * * " is incorrect.

hypothetical question which distorts instead of reflecting the evidence should not be permitted." See the authorities cited therein and in particular Wigmore on Evidence, Vol. 1, Section 682. While in the Doerksen case it was stated that a hypothetical question need not include all the facts in evidence nor facts or theories advanced by the adversary, the court made it very plain that the form and substance of the hypothetical question are to be subject to the fundamental principle enunciated. In United States v. Sessin, 10 Cir., 84 F.2d 667, 669, the court ruled that "The form of hypothetical question must be largely left to the trial court." Wigmore, supra, so states the law.

■ If on the other hand we hold that the District Court should have applied the Pennsylvania rule of evidence as more favorable to the reception of the evidence under the alternative principle suggested by Moore's Federal Practice (see § 43.02, Vol. 3, at p. 3065), we find that the defendant has misconstrued the law of Pennsylvania. The decisions cited by the defendant including that of Gillman v. Media, Middletown, etc., Electric Railway Company, supra, in our opinion have been overruled by the language employed by the Supreme Court of Pennsylvania in Sweeney v. Blue Anchor Beverage Co., 325 Pa. 216, 221, 189 A. 331, 333, which quotes with approval the section of Wigmore on Evidence heretofore cited in this opinion, " 'The court may well interfere to prevent (hypothetical) questions which are under the circumstances practically valueless, and are either intended or fairly likely to mislead the jury.' "

■■ An examination of the hypothetical question asked in the case at bar shows that the answer to it may well have resulted in a distortion of the insured's physical condition in the minds of the jury. The question includes all factors most favorable to the defendant's contention that Pierkowskie's death was not due solely to the accident. The question makes no reference to the pneumonia which the insured contracted and of which he died; it does not refer to any part of the medical testimony not favorable to the defendant. It includes under item "Sixteen" the statement that "the insured was totally and permanently disabled by bodily disease, that he was wholly prevented from performing any work, from following any occupation or from engaging in any business for remuneration or profit, * * *." This item of the question was quite out of order and seems to have been directed toward an erroneous theory held by the defendant's attorneys, that, because the insured had received absolute disability payments from the insurance company under the policy, this in itself constituted evidence that his death had not been caused by the accident. In the light of both the federal and the Pennsylvania law of evidence, we think it is obvious that the trial judge was under a duty to cause the hypothetical question asked of Dr. Bower to be rephrased so that the answer to it would present a fair and useful picture of the evidence to the jury. Since he permitted the question to be answered as asked we hold that the trial court committed error but that that error was in the defendant's favor.

■ The trial judge also required the defendant to qualify Dr. Bower further before he was permitted to answer the hypothetical question. This was not error. The average person certainly does not know that a gastroenterologist necessarily has specialized in internal medicine or that he deals constantly with diseases of the heart. Qualification on these points was essential if the answer to the question was to have any weight with the jury. The trial judge did deal sharply with the defendant's failure fully to qualify Dr. Bower in the first instance. He stated: "But we cannot trespass all over that. I have been patient and I have been gracious, and I think that once the witness has been turned over by counsel to opposing counsel, he ought to be finished. It seems to me both of you are competent lawyers. We have taken an unduly long time in trying this case, and I think when once a witness is turned over for cross-examination with respect to qualifications, he ought to be thoroughly qualified. That is almost rudimentary." The rebuke administered to defendant's counsel by the court was justified and the defendant does not assert that this particular action of the judge was prejudicial error.

We conclude that there is no merit to the allegation that the District Judge in his charge belittled the testimony of the defendant's medical witnesses while giving undue weight and emphasis to that of Dr. Pulaski because he was the insured's "family" physician.

The District Judge stated to the jury: "I shall resort to the evidence not in detail because it has been argued to you and presented to you, I think, very fully by both counsel, but I shall go over it with you, and if I advert to certain portions of the testimony, and not to others, or if I refer to certain witnesses and not to others, I do not want you to feel that the testimony I advert to is more important or in anywise more controlling in the decision which you reach than that which I do not advert to. The testimony given by all the witnesses is competent and should be taken into consideration in making the factual resolve which is yours, that of rendering a verdict either for the plaintiff or for the defendant."

The trial Judge referred then to the testimony of members of the Pierkowskie family and to that of Dr. Pulaski. He then stated, "The defendant then called a series of doctors", and proceeded to discuss the substance of what had been testified to by Doctors Cooke, Moyer, Conway, Burke, Bower and Leach. He then stated, "You have that testimony pitted against the testimony of Dr. Pulaski. Now, Dr. Pulaski I think it is only fair to say had an opportunity to observe this decedent from about 1934 on down to the time of his death. He was really his family physician. He saw him and he treated him. He knew of his heart condition. While he was not directly in charge of him at the hospital, he did go in, having other patients at the hospital, and did look at him almost every day, and when he was brought home on the 29th day of July down until his death in August 25 or 29, of 1940, he attended him almost daily, and in that four or five week period saw him daily and treated him in the hospital, seeing him at home, that in his professional opinion his death was due solely to the fractures of the right leg, the immediate cause being hypostatic pneumonia which was occasioned by his being immobilized in bed, which immobilization flowed from the fractures, and that the condition of the heart, kidneys, were not contributing factors directly or indirectly resulting in the death of the decedent.

"Now, it will be your duty to sort out of this tangled skein of controversy the truth of the situation just exactly as you see it. I cannot give you any yardstick for measuring the truth. In determining whether or not a witness is telling the truth, you will have to draw on your reservoir of human experience. In determining whether or not a witness is telling the truth, you will take into consideration his mannerism, his poise, his reluctance in testifying, if such was the case, as well as the quality of the testimony.

"I do not think that any of the doctors on either side deliberately stated what was not their best considered professional judgment, but knowing fallibility is to be attributed to doctors as well as other individuals, they may be wrong. It has been pointed out, for instance, that Dr. Moyer on one occasion thought he [Pierkowskie] was going to die right away, but I do not know that that is any particular disparagement of Dr. Moyer's professional judgment. The type of case may have run along those lines. It might be that one day he was well and another day he was very bad. As has been pointed out Dr. Moyer did not see him daily or monthly. He had not seen him for about a period of two years. It may be that one day he was very bad and another day he was better. There was an ebb and flow apparently to the heart condition. You will just have to determine from all those facts the exact cause of death, whether or not it was caused solely by external and violent means without this condition of the heart and of the kidneys being a contributing factor directly or indirectly of the death. In other words, you must measure the factual elements which you have heard in their fullness and completeness and which I have adverted to together with the rule of law which has been laid down for you.

"As I have already indicated to you, I know you will not be biased in anywise, prejudiced one way or the other, and you will give this case the consideration which it deserves because it is an important case. It is important to the insurance company, it is important to the beneficiaries under this policy. You will take the case and give proper consideration to the weight of the testimony as you have heard it, not only in conformity with your own good judgment but in conformity with the oath you took as jurors."

The trial court's observations in respect to the medical witnesses and what they had said were based on the evidence and within the federal rule that the trial judge may not only sum up the testimony but also should express his opinion on the evidence. See Quercia v. United States, 289 U.S. 466, 469, 53 S.Ct. 698, 77 L.Ed. 1321; United States v. Frankel, 2 Cir., 65 F.2d 285, 288, and Chapman v. Alton R.

936

Co., 7 Cir., 117 F.2d 669, 672. Cf. Hicks v. United States, 150 U.S. 442, 443, 14 S. Ct. 144, 37 L.Ed. 1137, Sacramento Suburban Fruit Lands Co. v. Melin, 9 Cir., 36 F.2d 907, and the decision of this court in Delaware and Hudson Co. v. Stankus, 3 Cir., 66 F.2d 186. The trial court in the instant case stayed well within permissible bounds. It seems to us that an unprejudiced tribunal must regard the trial court's charge to the jury as fair and impartial.

The defendant also takes the position that the jury's verdict was contrary to the weight of the evidence. This is not the fact. The jury could have found that Pierkowskie's death was caused solely by the accident which was the inducing cause of the pneumonia. The jury could have found otherwise. But the cause of Pierkowskie's death was a question for the jury and the District Judge properly left it there.

The remaining contentions of the defendant need not be commented upon. We have discussed the case at such length because of the gravity of the charge made by the defendant through its counsel against the trial judge. We think that it appears fully from what we have said that the appeal is without any merit.

The judgment is affirmed.