Kramer D. ARNOLD, Administrator of the Estate of Howard A. Brown, Deceased,

v.

Emily F. LOOSE, Executrix of the Estate of Warren L. Loose, Deceased, Appellant.

No. 15238.

United States Court of Appeals Third Circuit.

Argued June 18, 1965.

Decided Oct. 19, 1965.

Rehearing Denied Dec. 10, 1965.

---

McLaughlin, Circuit Judge, dissented.

McLaughlin and Ganey, Circuit Judges, dissented from the denial of rehearing.

James J. McCabe, Jr., Philadelphia, Pa. (Robert I. Cottom, Matten & Cottom, Reading, Pa., Duane, Morris & Heckscher, Philadelphia, Pa., on the brief), for appellant.

Milford J. Meyer, Philadelphia, Pa. (Charles H. Weidner, Reading, Pa., Meyer, Lasch, Hankin & Poul, Philadelphia, Pa., Stevens & Lee, Reading, Pa., of counsel on the brief), for appellee.

Before McLAUGHLIN, STALEY and FREEDMAN, Circuit Judges.

STALEY, Circuit Judge.

The administrator of the estate of Howard Brown brought an action under the Pennsylvania Wrongful Death Act and the Pennsylvania Survival Act against the executrix of the Estate of Warren Loose as the result of an automobile accident in Reading, Pennsylvania, in which both Brown and Loose were killed. The case was tried to a jury in the United States District Court for the Eastern District of Pennsylvania in March, 1964. The verdict was for the plaintiff in the Wrongful Death Action in the amount of $25,000 and in the Survival Action in the amount of $17,400. Because of the inadequacy of the verdict, plaintiff moved for a new trial solely on the issue of damages. This motion was granted, the case was retried in September, 1964, and a judgment for plaintiff was entered in the amount of $30,900 in the Death Action and $78,000 in the Survival Action. After a motion for a new trial was denied, defendant took this appeal alleging that the trial judge committed several errors. For the reasons hereinafter stated we affirm the judgment of the District Court.

The uncontroverted facts concerning the accident are these. Shortly after 3:00 PM on June 22, 1960, Loose was driving his Ford Thunderbird automobile in a westerly direction on a four-lane highway known as the Warren Street By-Pass. At the same time Brown, driving his pickup truck, was proceeding east on the same highway. At the end of a gradual curve to the left Loose's car went off the road on to the north shoulder of the highway for a distance of 163 feet, struck a washout on the shoulder and returned to the highway, crossing it at a 45-degree angle. The car then jumped the medial strip dividing the four lanes and collided with Brown's truck in the extreme right lane on the eastbound side. Brown was killed instantly. Loose died twelve hours later. There were several witnesses to the accident. One estimated that Loose was traveling 70 miles per hour while off on the shoulder of the road. Another witness testified that after the collision Brown's truck speedometer was stuck with the needle pointing to 50 miles per hour, which was the lawful speed limit on the highway where the accident occurred.

Appellant first contends that the trial judge erred in striking the testimony of Dr. Yund, an orthopedic surgeon, who was called as an expert witness for the defendant. Dr. Yund had treated Loose in the hospital emergency room shortly

after the accident. It was Dr. Yund's testimony that, in his opinion, Loose had lapsed into a diabetic coma, *causing the accident*. This testimony was stricken because Dr. Yund showed no experience, knowledge or background that would qualify him sufficiently to formulate such a judgment in this particular field.

■■ While it is the law in Pennsylvania that a physician, testifying as an expert, should not be barred from testifying merely because he is not a specialist in the field about which he is rendering an opinion, Taylor v. Monongahela Railway Co., 155 F.Supp. 601, 605 (W.D.Pa.1957), Pennsylvania has not thereby opened the door to such an extent that any doctor can testify about any medical subject without limitation. See Pierkowskie v. New York Life Insurance Co., 147 F.2d 928, 933 (C.A.3, 1945); Sleek v. J. C. Penney Co., 208 F.Supp. 207, 216 (W.D.Pa.1962), affirmed, 324 F.2d 467 (C.A.3, 1963); Gottlob v. Hillegas, 195 Pa.Super. 453, 171 A.2d 868, 872 (1961). On the contrary, the attorney who presents a medical expert has the initial burden of establishing his qualifications to render an opinion in a particular field. The trial judge must then make an estimation of the qualifications and a determination of competence. Pierkowskie v. New York Life Insurance Co., supra, 147 F.2d at 934.

■ An expert is competent to express an opinion if he has a "reasonable pretension to specialized knowledge on the subject under investigation." DeMarco v. Frommyer Brick Co., 203 Pa. Super. 486, 201 A.2d 234, 236 (1964). He must show at least a general familiarity with the field or that he has had some opportunity or means of acquiring special knowledge or experience with reference to the particular question. 1 Henry, Pennsylvania Evidence, § 563

For example, in the Hillegas case, supra, an expert on peripheral vascular diseases could not render an opinion as to the causal connection of injuries sustained in an accident and the victim's heart condition because the expert admitted he was not qualified to talk about the heart itself. Similarly, in Sleek, supra, a medical doctor was not found competent to testify as to whether hepatitis was related to a patient's trauma, since he did not even know the origin of hepatitis.

What we said in Trowbridge v. Abrasive Co. of Philadelphia, 190 F.2d 825, 829 (C.A.3, 1951) is well worth repeating here: "The qualification of an expert is a matter peculiarly within the discretion of the trial judge. It has been reiterated time and again that an appellate court will reverse on this ground only when the decision of the trial judge is clearly erroneous." [1] We have reviewed the record carefully and we conclude that the trial judge did not exceed his discretion. The record shows that when Dr. Yund was called to testify, plaintiff's attorney asked for an offer of proof. The justification offered by the defense for calling Dr. Yund was that he would render this startling opinion as to the cause of the accident. His testimony as it related to the accident was allowed subject only to proof of his qualifications. Thus, the crux of Dr. Yund's testimony was that Loose suffered a diabetic coma before he ran off the road which set off the chain of events that resulted in the collision. The purpose of this, of course, was to exonerate Loose of liability for the death of Brown. Therefore, since Dr. Yund's testimony was relevant only as it related to the cause of the accident, the pivotal determination made by the trial judge, with which we agree, was that Dr. Yund lacked the expertise to say diabetic coma caused the accident. [2]

---

1. Wigmore goes so far as to state that the qualifications of an expert should be left entirely within the discretion of the trial judge, and his discretion should never be disturbed. 2 Wigmore Evidence, § 561 (3rd Ed.).

2. It is interesting to note that no less than six doctors, including a specialist in internal medicine and a pathologist, examined Loose in the emergency room and the record does not indicate that any of them reached the same conclusion as Dr. Yund as to the cause of the accident.

■ Dr. Yund's qualifications revealed no special knowledge in the field of diabetes. By his own admission he had *never* read *any* text on diabetes or diabetic comas. He did not know who who was the leading authority on diabetes nor which was the leading treatise. His field of specialization was, in fact, orthopedics. Whether Dr. Yund believed himself qualified is of no significance. The trial judge was clearly within his discretion and we find no error.

■ One more point must be made in regard to Dr. Yund's opinion. His diagnosis that Loose was in a diabetic coma while being treated in the emergency room was admittedly conjecture on his part, for he had not eliminated the massive brain injury as a possible cause for Loose's comatose state.[3] Pennsylvania law is clear that an expert's opinion may not be based on guess or conjecture. Murray v. Siegal, 413 Pa. 23, 195 A.2d 790, 794 (1963). It is obvious that whether or not Loose entered a comatose state subsequent to the accident had no bearing on the question of his negligence.

■ Appellant would further have us believe that the lower court erred by not giving Mr. Cottom, counsel for the defendant, an opportunity to rehabilitate Dr. Yund after his testimony was stricken. It is impossible to reach such a conclusion from the record. The following colloquy pertaining to this contention bears this out:

"The Court: I will grant the motion. The doctor's testimony is stricken and will not be considered by the jury.

Mr. Cottom: That is all. Thank you, Doctor."

■■ Even assuming, arguendo, that Dr. Yund was qualified to express an opinion, the basis of an opinion should

rest not only on the facts of record, Murray v. Siegal, supra 195 A.2d at 793, but also without the omission of material facts necessary to form an intelligent opinion. Karavas v. Poulos, 381 Pa. 358, 113 A.2d 300, 304 (1955). The failure of both these prerequisites is clear in this case. Dr. Yund admitted that he based his opinion in part on medical history given to him. This history was not evidence of record. Dr. Yund also admitted that he was totally unaware of Loose's high blood sugar condition that was treated ten years before the accident. He was unaware that it had been diagnosed as the result of an infection and not as diabetes. This is clearly a material fact for Dr. Yund's opinion was based in part on the fact that Loose had high blood sugar when he was brought to the hospital subsequent to the accident. Furthermore, Dr. Yund admitted that he did not know that Loose had attempted to lift himself up two or three times while in his car after the collision.[4] This undisputed evidence was vital to the question posed to Dr. Yund and necessary to enable him to arrive at an intelligent conclusion. It is particularly important where a jury is likely to be confused. Karavas v. Poulos, supra.

■ The next two assignments of error may be disposed of briefly. Appellant contends that the question of contributory negligence should have been left to the jury. The trial judge found that there was not "the slightest scintilla of evidence" of any contributory negligence and therefore he properly charged it out of the case. Morran v. Pennsylvania Railroad Co., 321 F.2d 402, 404 (C.A.3, 1963). Our review of the record reaffirms this finding. In addition, no objection was made to the judge's charge although there was full opportunity to do so. Failure by counsel to object to an instruction before the jury retires precludes counsel from assigning error to

---

3. The record indicates that among the injuries Loose suffered was a massive brain injury.

4. Coma is defined as "a state of complete loss of consciousness from which the patient cannot be aroused even by the most powerful stimulation." Dorland, The American Illustrated Medical Dictionary. (22nd Ed.).

the instruction. Rule 51, Federal Rules of Civil Procedure.

 Appellant further contends that the grant of the second trial limited to the issue of damages was error because there was evidence in the first trial of contributory negligence that the jury in the second trial should have considered. We have already ruled, however, that there was no eror in charging the question of contributory negligence out of the case. A second trial limited to the question of damages is proper where damages in the first trial were not fairly assessed and the question of negligence is clear. Darbrow v. McDade, 255 F.2d 610, 611 (C.A.3, 1958).

 The next contention for our consideration is that the trial judge failed to adequately charge the jury that the amount awarded in the Wrongful Death Action for the loss to the widow and child of Brown should be deducted, along with decedent Brown's own maintenance, in computing the recovery under the Survival Act. It is clear to us that no objection to the charge was made by counsel for the defendant despite his allegation that the charge was obviously erroneous. The record plainly reveals that every opportunity was given to raise objections and to offer corrections to the charge. A second opportunity to object arose when the jury returned with a specific inquiry on this very element of the charge. This court has consistently held in applying Rule 51, Federal Rules of Civil Procedure, that error cannot be predicated upon an instruction to which no objection was taken and no opportunity thereby given the court to reconsider its language. Sowizral v. Hughes, 333 F.2d 829, 834 (C.A.3, 1964); Brown v. Pennsylvania Railroad Co., 282 F.2d 522 (C.A.3, 1960), cert. denied, 365 U.S. 818, 81 S.Ct. 690, 5 L.Ed.2d 696.

 Again assuming, arguendo, that timely objection had been made to the charge, we fail to find error. The trial judge first charged the jury as to the damages recoverable in the Death Action. No objection is raised here as to this instruction, as it is plainly correct. In his charge as to the recovery under the Survival Act, the judge emphasized that damages recoverable here were for the present worth of decedent's likely earnings for the period of his life expectancy and that they were to be reduced by the decedent's own cost of maintenance. He further stressed that the two figures arrived at must come from a common fund and that compensation for loss of earnings could not be duplicated. The jury was cautioned that the two figures taken together could not amount to more than Brown would earn in a lifetime. It would seem to us that although the charge was not the epitome of clarity, it sufficiently instructed the jury that the amount of damages recoverable in the Survival Action could not include provisions Brown would have made for his widow and child for this would be more than he would earn in a lifetime if the two figures are taken together. See Brodie v. Philadelphia Transportation Co., 415 Pa. 296, 203 A.2d 657, 660 (1964).

 Finally, Appellant contends that the verdict in the Survival Action upon re-trial was grossly excessive due to the alleged error made in the charge. The recovery in the Survival Action at the first trial was $17,400. The re-trial produced a verdict of $78,000. In a Survival Action where the loss of earning power is measured, many factors are considered. In addition to his salary, which was approximately $8,000 per year at the time of his death, Brown also owned a 35-acre farm where he grew vegetables and raised farm animals. He worked many hours of overtime in his position as a trained metals tester and he made valuable improvements on his farm. He was in excellent health and was known for his frugality. He was forty-nine years of age at the time of his death and he could have continued working to age seventy. Considering all these factors, we cannot say that the trial judge abused his discretion in failing to find the verdict excessive. Gullborg v. Rizzo, 331 F.2d 557, 561 (C.A.3, 1964); Darbrow

v. McDade, supra. The judgment of the district court will be affirmed.

McLAUGHLIN, Circuit Judge (dissenting).

I must disagree with the affirmance of the judgment in favor of the plaintiff on two grounds.

In the first trial, the district judge erroneously struck all the testimony of the treating physician as to what defendant's decedent, the driver of the other automobile involved in the two car collision, was suffering from when he was brought into Reading Hospital after the accident. The judge, sometime after granting the motion to strike, stated that his ruling was because the doctor "* * * showed a complete lack of any knowledge of the reactions to a diabetic coma. He showed absolutely no experience, and therefore I disqualified him as expert sufficiently to formulate judgment which he attempted to state in this case. I am excluding it completely upon his lack of expertise in the field on which he attempted to state an opinion." The actual trial sequence that brought about the motion to strike and the granting of same is revelatory:

"Q. You weren't told that. Now let's make it clear, Dr. Yund, that the diagnosis that you have expressed here in court today under oath as being your opinion was based solely upon what you have just told us and nothing else.

A. I should add some things.

Q. Suppose you add them, because we want to know precisely what you based your opinion on.

A. I recall this man's wife being present, and I recall asking—

Q. Just tell us this: *In addition to those things that you have mentioned, you also based your opinion on some history that you received?*

A. *That's right.*

MR. MEYER: *Your Honor, I don't think we need go further,* *I move to strike the doctor's testimony.*

THE COURT: *I will grant the motion. The doctor's testimony is stricken and will not be considered by the jury.*

MR. COTTOM: That is all. Thank you Doctor.

THE COURT: I don't think he is competent or has the background to express the opinion he did." (Emphasis supplied)

The fact that the doctor had some previous history of his unconscious patient from the latter's wife which he considered in his diagnosis would seem to have been the triggering factor for the motion to strike and its allowance. This did not appear in the court's later assignment of reasons for granting the motion nor is it mentioned in the majority opinion. In this connection and completely overlooked at the trial was the fact that Dr. Yund was the actual treating physician. Overlooked too was the fact that previous medical history of the patient who was unconscious when Dr. Yund first saw him and thereafter until he died, coming from the closest available source, his wife, was of the utmost importance to the doctor in the effort to save the patient's life. The unmistakable inference from the record is that the striking of the testimony was at least in a substantial degree because in reaching his opinion the doctor included some history of his patient from the latter's wife. As treating physician he was bound to obtain available prior history of his patient and evaluate it in connection with all the other knowledge he had obtained through his examinations, treatment and various tests.

The specific history which the plaintiff objected to Dr. Yund having and considering in his treatment of Mr. Loose was the conceded fact that Mr. Loose while at the Reading Hospital had a high blood sugar content in 1950. Strange as it may seem, a question of plaintiff's attorney directed to Dr. Yund makes it

quite evident that plaintiff's own information was that the Loose abnormal blood sugar count in 1950 was 475 milligrams, the same as after the present accident. That question read, "Did you know that the blood sugar of 475 it has been here testified here that this man had had ten years before as a result of infection?" Dr. Yund answered that question, "No, I didn't know that." Even though a doctor in 1950 might have thought the high blood sugar count at that time was due to infection, with that same significant element appearing in the Loose 1960 examination and no claim whatsoever that it was due to infection, obviously the Loose authentic 1960 high blood sugar content was a factor that a diabetic specialist or any treating doctor had to take heed of in arriving at his own diagnosis.

The court's later extended reasons for striking the doctor's evidence held that Dr. Yund " * * * showed a complete lack of any knowledge of the reactions to a diabetic coma. He showed no experience." Therefore the court eliminated the doctor's testimony " * * * upon his lack of expertise in the field on which he attempted to state an opinion."

Dr. Yund was graduated from the University of Pennsylvania Medical School in 1947. After that as he said, "I had one year of surgical training after a year of internship, three years as a medical missionary in Africa, two years of general surgery training, three years of orthopedic surgery training, two years in the Army, and then into practice." He commenced private practice in January 1959. He is an associate on the orthopedic surgery staff at the Reading Hospital, the Good Samaritan Hospital, Pottsville, the Ephrata Hospital and the Community General Hospital in Reading. Regarding his treatment of diabetes there were these questions and answers:

"Q. Doctor, is a knowledge of other phases of medicine and general body conditions necessary to the proper practice of othopedics?

A. Surely.

Q. In the course of your practice as an orthopedic surgeon, Doctor, do you have occasion to treat diabetic patients?

A. Yes.

Q. Do diabetic patients require any specialized care so far as orthopedics is concerned?

A. Yes.

Q. Are you called upon to make a diagnosis of diabetes from time to time in your patients?

MR. MEYER: Objected to.

THE COURT: Sustained."

The reasons for the above objection and sustaining it do not appear.

The doctor testified of treating Mr. Loose in the Reading Hospital after the accident. He told of blood count, urine, blood sugar and a $CO_2$ combining power tests being made. His diagnosis as entered on the hospital chart was that Loose had severe maxillo facial injuries and diabetic coma. *His opinion was that Loose " * * * had lapsed into a diabetic coma, causing this accident."* (Emphasis supplied). On cross-examination he was asked and answered as follows:

"Q. Did you ever make a diagnosis of diabetic coma before June 22, 1960?

A. Surely.

Q. When?

A. We did it frequently during the internship and residency training, because we were called upon to treat people with severe injuries and other complications of injuries which came under our care.

* * * * * *

Q. At the University of Pennsylvania did you take any courses

in which you studied diabetes or in which the symptomatology of diabetes was taught you?

A. Surely.

Q. What text did you use?

A. The one I recall is "Cecil's Textbook of Medicine."

\* \* \* \* \* \*

Q. Have you studied any of the texts on diabetes?

A. Surely.

\* \* \* \* \* \*

Q. Have you ever discussed diabetic coma with any internist?

A. Surely.

Q. With whom?

A. Many of my confreres at the hospital. Do you wish names, sir?

Q. I would love to have the name of an internist with whom you discussed it.

A. Well, Dr. Ember, Dr. Rettew, Dr. Reifsnyder, Dr. Jay and Dr. McShane."

Dr. Yund explained at length the factors he found himself and through the hospital tests leading to his diagnosis of diabetic coma. These were the blood sugar elevated to 475 milligrams, the decrease in the carbon dioxide combining power of 15 millequivalents, 3 plus urine sugar, a moderate acetone in the urine and the patient's general response to his injury. There was uncontradicted evidence that normal blood sugar would have been 60 to 100 milligrams. It is also uncontradicted that Mr. Loose had had high blood sugar prior to his accident.

Dr. Yund admittedly did not specialize in diabetes. Nor did he pretend any glib familiarity with certain current treatises on that disease. But he was an experienced physician, well grounded generally in diabetes. Especially was he familiar with the classic condition of diabetic coma and in just such a situation as Mr. Loose was in when he was brought into the hospital suffering from severe injuries and complications. Dr. Yund's unchallenged testimony was that he had frequently during internship and residency training made diagnoses of diabetic coma when called upon to treat people with severe injuries "which came under our care." Diabetic coma is no late discovered factor in diabetes. It has been known to the medical profession as long as the disease itself.

The supposed clincher in support of the wiping out of Dr. Yund's evidence is that his diagnosis of diabetic comas was "admittedly conjecture on his part, for he had not eliminated the massive brain injury as a possible cause for Loose's comatose state." That conclusion finds no corroboration in the trial transcript. Dr. Yund, with a sound diagnostic background in serious accident cases, found severe maxillo-facial injuries. He did not arbitrarily rule them out as a contributing cause of Mr. Loose being in a coma but in his opinion he did not find that those injuries brought on the coma. He explained carefully and thoroughly his reason for that, saying:

"Well, this is a differential diagnosis. When a patient is comatose it could be from many things. One would naturally think of his head injury as being a likely possibility. In his particular case his pulse was 168 and if he had severe hemorrhage intracranially, I would expect his pulse to be decreased from normal. His respirations were 60. I would expect them to be decreased if he had intracranial hemorrhage. His pupils were equal and reacted to light. I would have expected them to be unequal and not reacting if his comatose condition were due to his brain damage."

Despite all of the above, the trial judge, in the utmost good faith, from the record apparently because his own diagnosis differed from that of the doctor, struck out Dr. Yund's entire testimony. There is no applicable decisional

law which validly approves that decision. At most, the issue was one of credibility and for the jury to pass upon. This was no dispute over the content of a hypothetical question directed to a so-called expert who had never seen or treated the patient. It was the evidence of a highly competent doctor who had been called in by the hospital to treat an urgent ambulance patient. He was the one person who actually had first hand knowledge of Mr. Loose's condition. Based on that fundamentally, plus minor collaterals including a true history of high sugar content ten years before which might or might not have been properly ascribed to infection, Dr. Yund made his diagnosis of diabetic coma. And there is not one word in the record that authentically refutes him.

The majority opinion cites Pierkowskie v. New York Life Ins. Co., 147 F.2d 928 (3 Cir. 1944) as ground for its position. Even the court's conclusion of what happened in that suit does not justify its action here. It says, "On the contrary, the attorney who presents a medical expert has the *initial burden* of establishing his qualifications to render an opinion in a particular field. *The trial judge must then* make an estimation of the qualifications and a determination of competence." (Emphasis supplied). In the trial at bar Dr. Yund was called as a witness by the defense. His offered testimony was objected to in depth including the charge that he was not competent to make a diagnosis in this instance. Following that the doctor took the stand and gave his qualifications and full testimony. The latter was objected to throughout its course, including the diagnosis. The court also took part in the examination of the doctor. All of the doctor's testimony was admitted. On cross-examination there was a blustering attack on the doctor's credibility. It was after that as above set out that the court struck the evidence. The fuss in Pierkowskie was over content of a hypothetical question. That is not the true problem in this appeal. What was sought to be expunged was the working diagnosis of the treating physician and his opinion that such condition had been in existence for approximately an hour prior to the patient arriving at the hospital. Pierkowskie is of substantial interest to us in this action if it is read fully. This court there held p. 933 re hypothetical questions that "Treating the hypothetical question as being subject to the provisions of Rule 43(a), since it was designed to elicit an answer intended to be evidentiary, we conclude that under the applicable federal decisions the District Judge had the duty to cause the question to be so modified that the answer to it would prove helpful to the jury in determining the issue presented." Above all, Pierkowskie, tried in the very same district court as the instant litigation, is most illuminative on the competency of a reputable experienced specialist in another field treating a hospital emergency patient and diagnosing a simple, fundamental and important organic condition in connection with various traumas of the head and legs. In Pierkowskie, the hospital's assistant surgeon who testified at the trial had done just that. He found the traumas and then as our opinion states (p. 931), "Dr. Burke found also that Pierkowskie was suffering from a very serious heart condition." Practically speaking it would be impossible to find closer parallel circumstances anywhere let alone this circuit.

The court cites DeMarco v. Frommyer Brick Co., 203 Pa.Super. 486, 201 A.2d 234 (1964) as favoring its view. Under the language quoted it is attempted avoidance of reality to suggest that Dr. Yund did not have any reasonable pretension to specialized knowledge of an ordinary and perhaps the best known condition in connection with diabetes. Testifying to his experience as a young hospital intern and doctor he had established his sound knowledge of that stage of diabetes. That part of the DeMarco opinion (p. 490–491, 201 A.2d 234, 236) which immediately follows a phrase from it quoted by the court affirms two Pennsylvania doctrines which should be guide

marks in deciding this issue. The opinion reads:

"'* * * "The test applied must not set the standard of qualification so high as to exclude the only available kind of testimony ordinarily obtainable in such cases". White v. [Western Allegheny] R.R. Co., 222 Pa. 534, 537, 71 A. 1081, 1082. Whether the knowledge of the witness justifies the admission of his testimony is a matter for preliminary inquiry by the trial court, being largely a question within its discretion * * *'. McCullough v. Holland Furnace Co., 293 Pa. 45, 49, 141 A. 631, 632."

The court opinion after citing Taylor v. Monongahela Railway Co., 155 F.Supp. 601, 605 (W.D.Pa.1957) states that "Pennsylvania has not thereby opened the door to such an extent that any doctor can testify about any medical subject without limitation." It refers to Pierkowskie, supra, which we have already dealt with in depth. It cites in addition, Sleek v. J. C. Penney Co., 208 F.Supp. 207, 216 (W.D.Pa.1962) and Gottlob v. Hillegas, 195 Pa.Super. 453, 171 A.2d 868 (1961). Those two decisions have to do with the testimony of doctors where the latter would not state that there was a causal connection between the injury and the condition claimed to be due to it. They have nothing to contribute to our problem. The court's statement which they are said to corroborate needs no help but it has nothing to do with the evidence of Dr. Yund. The scholarly opinion of Judge McIlvaine in Taylor, supra, cannot be so casually disregarded. It is unquestionably sound law in this circuit and in Pennsylvania. There the physician witness was *not* the treating doctor. He testified from laboratory reports and the history he received. With reference to those testimonial circumstances the court quoted with approval McCormack on Evidence p. 33 (1954):

"'* * * that an expert in a science is presumably competent to judge of the reliability of statements made to him by other investigators or technicians. * * * If the statements, then, are attested by the expert as the basis for a judgment upon which he would .act in the practice of his profession, it seems that they should ordinarily be a sufficient basis even standing alone for his direct expression of professional opinion on the stand, and this argument is reinforced when the opinion is founded not only upon such reports but also in part upon the expert's first hand observation.'"

And the court held 155 F.Supp. p. 605:

"The defendant urges that the witness was not competent to testify because he was not a neurologist. However, Dr. Weill is a licensed physician and has had considerable experience in the diagnosing of cases. The defendant has been unable to show any case in any court where a competent physician has been barred from testifying because he was not a specialist. His lack of specialization could be argued to the jury as affecting the weight of his testimony, but his training as a physician and his experience in diagnostic work renders him competent to give an opinion."

The trial judge also erred grievously with respect to the damage branch of this suit. At the first trial the jury received the cause absent the heart of the defense. There was a verdict in the Death Action of $25,000 and a verdict in the Survival Action of $17,400, making a total of $42,400. The district court thereafter granted plaintiff a new trial on damages only. In the Survival Action part of the charge, the court plainly instructed the jury that in computing damages the only allowable deduction from the loss of decedent's earning power was the reasonable cost of decedent's own maintenance and did not charge the jury that any amounts awarded in the wrongful death action for the loss to the surviving wife and child should also be deducted. That

is the admitted Pennsylvania law. Ferne v. Chadderton, 363 Pa. 191, 69 A.2d 104 (1940); Skoda v. West Penn Power Company, 411 Pa. 323, 191 A.2d 822 (1963). The court opinion is silent on this. However, it puts its stamp of approval on the plain error before us by the simple statement that no objection was made to it. Objection should have been made but in the light of the mistaken view of the particular Pennsylvania governing principle given the jury for guidance, the lack of objection is excused as it should be. The result was a palpable miscalculation of the damages on this branch of the claim. The verdict in the survival action on the second trial, confined to damages, was $78,000. The death claim verdict was $30,900, totalling $108,900. This represented an increase of $66,500 which was over two and a half times the original verdicts.

We are rightly reluctant to interfere with jury verdicts in tort causes. This appeal and this dissent are not attacking that practice. The first jury verdicts in these claims were rendered without the jury being allowed the opportunity of considering the defense on the merits. The second jury merely fixed the amounts of its verdicts under erroneous instructions.

The district court judgments should be reversed and remanded for a new trial on the merits.

### ON PETITION FOR REHEARING

Before KALODNER, Chief Judge, and McLAUGHLIN, STALEY, HASTIE, GANEY, SMITH and FREEDMAN, Circuit Judges.

### PER CURIAM.

The petition for rehearing in this case has been considered and presents no new argument. A majority of the circuit judges in regular active service not having voted for rehearing in banc, the petition for rehearing will be denied.

Judge McLAUGHLIN and Judge GANEY desire that their dissents from the denial of rehearing be noted.