# Wexler v. Hecht

*Lee S. Bender,* for appellant.
*Thomas M. Savon,* for appellee.

TERESHKO, *J.,* August 13, 2003—Before the court is the appeal taken by Beverly Wexler from this court's order of December 18, 2002. After considering defendant's motion in limine to preclude plaintiff's expert, Lawrence Lazar's D.P.M. testimony critical of defendant Paul J. Hecht M.D., as well as defendant's memorandum of law in support thereof, this court precluded Wexler's doctor of podiatric medicine (Lawrence Lazar) from testifying as an expert witness against defendant doctor of medicine (Paul J. Hecht). Moreover, due to Wexler's failure to provide a legally competent expert witness, this court, on the same day, granted Dr. Hecht's motion for summary judgment and thereby dismissed Wexler's complaint against Dr. Hecht. On January 8, 2003, Wexler appealed that order.

On January 16, 1998, Beverly Wexler, who had complained of a bunion on her left foot, underwent foot surgery at the former Allegheny University Hospital-East, Hahnemann University, in Philadelphia, Pennsylvania. Paul J. Hecht M.D. and Donald W. Mazur M.D., both of whom have specialized in the subspecialty of orthopedic surgery, performed the procedure which was a left hallux valgus repair with proximal osteotomy and biofix absorbable screw.

On November 3, 1999, Wexler filed a complaint against Dr. Hecht and Dr. Mazur. Wexler alleged that as

a result of the surgery, she experienced "significant recurrence of hallux abducto valgus deformity, metatarsus primus varus deformity in the first metatarsal, continued presence of the bunion, functional hallux limitus, reduced range of motion, pain and discomfort and related symptoms which required subsequent surgical repair." (Compl. ¶6.) Wexler alleged that Drs. Hecht and Mazur breached the requisite standard of medical care and thus treated her negligently. (See Compl. ¶8a-n.) In a second count, Wexler further alleged that the defendants failed to fully and reasonably inform her of the material risks of the surgery and, therefore, committed a battery upon her. (Compl. ¶¶11-12.) Wexler maintained that as a result of the alleged negligence and the alleged battery, she suffered severe, painful, and permanent injuries and deformities to her left foot; disfigurement; pain and inconvenience; a loss of earnings and future earning capacity; medical bills; expenses related to her injuries; embarrassment, humiliation, mental anguish, loss of life's pleasures, and damages. Specifically, Wexler demanded judgment in her favor against Dr. Hecht and Dr. Mazur, jointly and severally, in excess of $50,000, exclusive of interest and costs.

On March 7, 2000, this court issued a case management order that, among other things, ordered Wexler to submit to all other parties a curriculum vitae of, and expert report from, every witness she intended to call to testify at trial. Wexler was ordered to submit those credentials no later than July 2, 2001.

On September 18, 2000, a stipulation to dismiss was filed to dismiss with prejudice Dr. Mazur as a defendant,

leaving Dr. Hecht as the sole defendant. Both parties agreed thereto.

On November 27, 2002, Dr. Hecht filed a motion in limine to preclude Wexler's expert, Dr. Lazar, from testifying against him at trial, as well as a motion in limine to preclude the testimony of R. Case M.Ed. On December 13, 2002, Wexler filed an answer to the motion pertaining to Dr. Lazar and, on December 18, 2002, this court marked as moot the motion pertaining to Case, upon advice that Case would not be called as a witness at trial.

Also on December 18, 2002, this court, following consideration of Dr. Hecht's motion in limine, granted that motion by precluding Dr. Lazar from testifying as an expert witness against him. Since Wexler had offered no other competent expert into the record, this court, on the same day, granted Dr. Hecht's motion for summary judgment, which was dispositive of the matter.

On January 8, 2003, Wexler appealed from the December 18, 2002 order. On January 14, 2003, this court ordered Wexler to submit a concise statement of matters complained of upon appeal, pursuant to Pa.R.A.P. 1925(b). On January 24, 2003, Wexler made timely filing of her 1925(b) statement, in which she raises the following matters on appeal:

"Did the trial court err in finding that the plaintiff's medical expert, a podiatrist, was not qualified to testify as an expert against the defendant, an orthopedist, in a medical malpractice case where:

"(1) The specialty overlap in practice;

"(2) The podiatrist knows, is aware of and can testify as to the standard of care in the field of orthopedics based

on his own training and education, and especially where the defendant himself has testified as to what the standard of care is and the evidence shows that he failed to meet it;

"(3) Under MCARE Act §512 [sic] (c)(1), (2), (3), the plaintiff's podiatrist expert practices in a subspecialty which has a substantially similar standard of care as the defendant orthopedist, is board-certified in a similar approved board as the defendant and has performed this particular procedure himself;

"(4) The subsequent treating physician who did two repair surgeries on the plaintiff is a podiatrist—not an orthopedist; and

"(5) The trial court erred and abused its discretion by failing to permit plaintiff's expert to testify regarding his qualifications at the motion in limine hearing despite plaintiff's counsel's urging and request to hear from the expert in person."

## THE MOTION IN LIMINE
## TO PRECLUDE THE EXPERT

Pennsylvania courts have ruled that "[a] motion in limine is a procedure for obtaining a ruling on the admissibility of evidence prior to or during trial, but before the evidence has been offered." *Commonwealth v. Johnson,* 399 Pa. Super. 266, 269, 582 A.2d 336, 337 (1990), *aff'd,* 534 Pa. 51, 626 A.2d 514 (1993) (citation omitted); see *Commonwealth v. King,* 456 Pa. Super. 72, 77, 689 A.2d 918, 921 (1997). Moreover, Pennsylvania courts, reviewing the scope and the purpose of a motion in limine, have ruled that "[a] motion in limine is a pre-

trial application before a trial court made outside the presence of a jury, requesting a ruling or order from the trial court prohibiting the '[sic] opposing counsel from referring to or offering into evidence matters so highly prejudicial to the moving party that curative instructions cannot alleviate an adverse effect on the jury.' " *Commonwealth v. Noll,* 443 Pa. Super. 602, 605, 662 A.2d 1123, 1125 (1995). (citation omitted)

The *Noll* court ruled, accordingly, that "[t]he purpose of a motion in limine is twofold: (1) to provide the trial court with a pretrial opportunity to weigh carefully and consider potentially prejudicial and harmful evidence; and (2) to preclude evidence from ever reaching a jury that may prove to be so prejudicial that no instruction could cure the harm to the defendant, thus reducing the possibility that prejudicial error could occur at trial which would force the trial court to either declare a mistrial in the middle of the case or grant a new trial at its conclusion." *Noll,* 443 Pa. Super. at 605-606, 662 A.2d at 1125 (citation omitted); see *Commonwealth v. Metzer,* 430 Pa. Super. 217, 227, 634 A.2d 228, 232 (1993).

This court's analysis of the legal competency of Wexler's expert begins with the Medical Care Availability and Reduction of Error Act, known as the MCARE Act, which became effective on May 13, 2002.

Section 1303.512 of the MCARE Act addresses, in pertinent part, the matter of expert qualifications:

"(a) General rule.—No person shall be competent to offer an expert medical opinion in a medical professional liability action against a physician unless that person possesses sufficient education, training, knowledge and

experience to provide credible, competent testimony and fulfills the additional qualifications set forth in this section as applicable.

"(b) Medical testimony.—An expert testifying on a medical matter, including the standard of care, risks and alternatives, causation and the nature and extent of the injury, must meet the following qualifications:

"(1) Possess an unrestricted physician's license to practice medicine in any state or the District of Columbia.

"(2) Be engaged in, or retired within the previous five years from, active clinical practice or teaching. Provided, however, the court may waive the requirements of this subsection for an exert on a matter other than the standard of care if the court determines that the expert is otherwise competent to testify about medical or scientific issues by virtue of education, training or experience.

"(c) Standard of care.—In addition to the requirements set forth in subsections (a) and (b), an expert testifying as to a physician's standard of care also must meet the following qualifications:

"(1) Be substantially familiar with the applicable standard of care for the specific care at issue as of the time of the alleged breach of the standard of care.

"(2) Practice in the same subspecialty as the defendant physician or in a subspecialty which has a substantially similar standard of care for the specific care at issue, except as provided in subsection (d) or (e).

"(3) In the event the defendant physician is certified by an approved board, be board certified by the same or a similar approved board, except as provided in subsection (e)." 40 P.S. §1303.512. Expert qualifications.

For reasons that will be set forth in detail in what follows:

(1) This court, pursuant to section 1303.512(a) concluded that Dr. Lazar, while likely a competent podiatric surgeon, does not possess sufficient education, training, knowledge and experience in orthopedics and is not sufficiently familiar with the standard of care operative among orthopedic surgeons to provide credible, competent testimony about a standard of care appropriate to Dr. Hecht.

(2) Although Dr. Lazar does not possess an unrestricted physician's license to practice medicine in Pennsylvania, he did opine extensively about the standard of care, risks to and alternatives available for Wexler, causation, and the nature and extent of Wexler's injury, but by so opining Dr. Lazar ran afoul of section 1303.512(b)(1).

(3) Since orthopedic surgery, as a subspecialty of medical surgery, differs by definition in a material way from podiatric surgery, this court, pursuant to section 1303.512(c)(1), precluded Dr. Lazar from testifying against Dr. Hecht for the reason that Dr. Lazar provided no evidence that he was substantially familiar with an orthopedic standard of care that was applicable to the specific care required by Wexler.

(4) As a podiatric surgeon, Dr. Lazar does not practice in the same subspecialty of orthopedic surgery as Dr. Hecht, nor does Dr. Lazar practice in a subspecialty which has a substantially similar standard of care to orthopedic surgery for the specific care required by Wexler. Dr. Lazar thereby fails the test of section 1303.512(c)(2).[1]

---

1. See 61 Am.Jur.2d Physicians, Surgeons and Other Healers §195 (2002): "A physician is entitled to have his treatment of his patient

In Pennsylvania, case law principles are in complete accord with the MCARE Act's requirements regarding expert testimony. Our Supreme Court has ruled that a plaintiff must submit a medical expert's report to sustain the prima facie burden of a medical malpractice cause of action. See *Toogood v. Rogal D.D.S.,* 2003 WL 21241255 (Pa.) "[I]n malpractice cases . . . a jury will not be permitted to find negligence without expert testimony to establish variance from accepted medical practice." *Strain v. Ferroni M.D.,* 405 Pa. Super. 349, 355, 592 A.2d 698, 701 (1991) (quoting *Chandler v. Cook,* 438 Pa. 447, 451, 265 A.2d 794, 796 (1970)). "[T]he patient must offer an expert witness who will testify to a reasonable degree of medical certainty, that the acts of the physician deviated from good and acceptable medical standards, and that such deviation was the proximate cause of the harm suffered." *Rauch v. Mike-Mayer M.D.,* 783 A.2d 815, 824 (Pa. Super. 2001). (citations omitted)

To establish her case of professional negligence against Dr. Hecht, Wexler was required to show that the professional conduct of Dr. Hecht fell below the standard of

tested by the rules and principles of the school of medicine to which he belongs, and not by those of some other school, because a person professing to follow one system or school of medicine cannot be expected by his patient to practice any other, and if he performs the treatment with ordinary skill and care in accordance with his school of practice, he is not answerable for bad results." See also, 61 Am.Jur.2d Physicians, Surgeons and Other Healers §326 (2002): "Physicians of one school of practice may be incompetent to testify in malpractice actions against physicians of another school of practice, because the defendant in a malpractice action is entitled to the testimony of competent practitioners of his own school of medicine on the issue of whether he exercised the requisite degree of skill and care in providing medical treatment."

reasonable medical practice as to orthopedic surgeons and that Wexler's injuries were caused by Dr. Hecht's failure to adhere to such orthopedic standards. See *Lira v. Albert Einstein Medical Center,* 384 Pa. Super. 503, 508-509, 559 A.2d 550, 552 (1989). "As a general rule, expert testimony is required to establish the standard of reasonable medical care." *Id.* at 509, 559 A.2d at 552.

This court is mindful of the Pennsylvania Supreme Court's ruling that "[i]n Pennsylvania, a liberal standard for the qualification of an expert prevails." *Commonwealth v. Marinelli,* 570 Pa. 622, 640, 810 A.2d 1257, 1267 (2002). (See *Bindschusz v. Phillips,* 771 A.2d 803, 807 (Pa. Super. 2001)). "Generally, 'if a witness has any reasonable pretension to specialized knowledge on the subject matter under investigation he may testify and the weight to be given to his evidence is for the [fact-finder].' " *Id.,* 810 A.2d at 1267. (citations omitted) "It is also well established that an expert may render an opinion based on training and experience; formal education on the subject matter is not necessarily required." *Id.,* 810 A.2d at 1267. (citations omitted)

Nevertheless, "[a]s explained by our Supreme Court in *Collins v. Hand,* 431 Pa. 378, 246 A.2d 398 (1968), the standard of care in medical malpractice actions is first and foremost what is reasonable under the circumstances." *Joyce v. Boulevard Physical Therapy & Rehabilitation Center P.C.,* 694 A.2d 648, 656 (Pa. Super. 1997). Pennsylvania courts have ruled that "it may appear that the scope of the witness' experience and education may embrace the subject in question in a general way, but the subject may be so specialized that even so, the witness will not be qualified to testify." *Dambacher*

*by Dambacher v. Mallis,* 336 Pa. Super. 22, 43, 485 A.2d 408, 419 (1984). For example, a Pennsylvania court ruled that it was outside the specialization and competency of an anesthesiologist to testify as an expert witness on an autopsy report that a pathologist had written and already testified about. *Capan v. Divine Providence Hospital,* 270 Pa. Super. 127, 139, 410 A.2d 1282, 1287 (1980).

"While it is the law in Pennsylvania that a physician, testifying as an expert, should not be barred from testifying merely because he is not a specialist in the field about which he is rendering an opinion, Pennsylvania has not thereby opened the door to such an extent that any doctor can testify about any medical subject without limitation." *Arnold v. Loose,* 352 F.2d 959, 962 (1965). (internal citations omitted; references omitted) "[T]he attorney who presents a medical expert has the initial burden of establishing his qualifications to render an opinion in a particular field." *Id.,* 352 F.2d at 962. The *Arnold* court held that the particular qualifications of an orthopedic surgeon did not in any way qualify him to render an expert opinion on diabetes or diabetic comas. *Id.,* 352 F.2d at 963.

In the present matter, Wexler, pursuant to this court's case management order of March 7, 2000, timely submitted the curricula vitae of Lawrence Lazar D.P.M., offering Dr. Lazar as her medical expert to testify about the standard of care given by an orthopedic surgeon. This court understands that Dr. Lazar is an expert in foot surgeries, as well as in post-surgical treatment and care of patients in accordance with standards adopted and followed by podiatric surgeons, and that Dr. Lazar could rightfully give a legally competent opinion about the rea-

sonable standard of care applicable to a podiatric surgeon. But, as will be set forth in detail below, Dr. Lazar is not a licensed medical doctor, and a reasonable knowledge of standards of care offered by medical doctors in general and orthopedic surgeons in particular lies beyond the ken of a podiatrist who has neither formal academic training in, nor practiced, clinical experience of, an orthopedist's approach to foot surgery or an orthopedist's manner of post-surgical care and treatment of an orthopedic patient.

What is reasonable under the circumstances of the present case is that orthopedics is a particular subspecialty of medical surgery outside the area of expertise of a podiatric surgeon, and that, therefore, it would be unreasonable to qualify Dr. Lazar as an expert competent to opine about a standard of care distinctive of orthopedic surgeons.

Although Pennsylvania subscribes to a liberal standard for the qualification of experts, and although Pennsylvania is clear that formal education in a subject is not necessarily required to establish an expert in a given field, the court in *Toogood* held that a jury will not be permitted to find negligence without competent expert testimony to establish variance from accepted medical practice. Given the qualifications of Dr. Lazar, this court holds that Dr. Lazar is not legally competent to judge if Dr. Hecht's care and treatment of Wexler amounted to a variance from medical practice appropriate to other orthopedic surgeons.

In this matter, this court utilized a straightforward application of the MCARE Act and the relevant case law

principles to find that Dr. Lazar fails both statutory and case law tests for competent expert testimony.

This court recognizes that, in Pennsylvania, practitioners of one school of medicine or of one medical subspecialty may testify against specialists in another specialty if the particular circumstances of the case so warrant, "provided that the witness is familiar with the applicable standard of care." See 61 Am.Jur.2d §326 at 76924; see also, *Dambacher by Dambacher v. Mallis,* 336 Pa. Super. 22, 485 A.2d 408 (1984) (citing rulings from other jurisdictions where courts have held, inter alia, that a physician unlicensed in podiatry was not qualified to testify in a malpractice action against a podiatrist, and that an orthopedic surgeon unfamiliar with the practice of podiatry was not qualified to testify as to the standard of care required of a podiatrist).

"[E]ven if there is no requirement that a witness practice the same specialty as the defendant, the witness must be sufficiently familiar with the standard of care of the specialist and be able to give relevant testimony on the subject. Thus, in a malpractice action against a podiatrist, an orthopedic surgeon is not qualified to testify as an expert on the standards of good podiatric practice, where the expert testifies that he has had no training in podiatry, is not licensed in podiatry, and has received no instruction in the practice of podiatry, and is not familiar with podiatric journals and periodicals or with the standards of professional care generally observed by podiatrists." See 61 Am.Jur.2d §326 at 76924. (footnotes omitted)

On July 6, 2001, Dr. Lazar submitted a detailed report on the treatment Wexler received from Dr. Hecht. In his report, Dr. Lazar undertook "to determine, to a reason-

able degree of medical certainty, whether or not there was a deviation from the normal standard of care." (Dr. Lazar's report at 2.) Dr. Lazar wrote that he is in complete accord with Dr. Hecht's assessment that, based on the preoperative radiographs, Wexler's intermetatarsal angle measured 18 degrees. Yet, based on postoperative radiographs, differences apparently appeared between Dr. Lazar's and Dr. Hecht's measurements of Wexler's intermetatarsal angle. Dr. Lazar's measurement was 14 degrees; another podiatrist, whom Dr. Lazar consulted, arrived at the same measurement. Dr. Lazar nowhere explicitly stated what measurement Dr. Hecht arrived at; instead, he wrote that "[i]n his deposition, Dr. Hecht states that a *normal* intermetatarsal angle to be 14 degrees." (Report at 3.) (emphasis added) Dr. Lazar stated: "It is my opinion, that within a reasonable degree of medical certainty, Dr. Paul J. Hecht deviated from the *normal* standard of care in the following ways." (Report at 3.) (emphasis added) Dr. Lazar thereupon itemized what he judged to be Dr. Hecht's deviations from "the normal standard of care."

To substantiate his opinion on the accuracy of his own measurements of Wexler and the inaccuracy of Dr. Hecht's, Dr. Lazar averred that "[t]he scientific literature states that a *normal* intermetatarsal angle is less than or equal to eight degrees." (Report at 3.) (emphasis added) Dr. Lazar never identified, however, which literature he relied upon to judge the different measurements as "normal." Did he have in mind "norms" as formulated by podiatrists or "norms" as understood by orthopedic surgeons? Was "normal" what accorded with a podiatric understanding of Wexler's surgery, or an orthopedic un-

derstanding of it? Dr. Lazar referred to that literature only generically as "scientific," without identifying the books, periodicals, or journals he was relying on, and without specifying whether that literature was orthopedic or podiatric literature.

Dr. Lazar, judging that Dr. Hecht's surgery resulted in an "abnormal[]" medical condition for Wexler, again relied on an understanding of "norms" that he does not make explicit. (Report at 3.) This court can only reasonably infer that the "norms" Dr. Lazar appealed to, to judge Dr. Hecht by, are norms familiar to podiatrists, but not necessarily observed by orthopedic surgeons. Indeed, the two medical persons Dr. Lazar consulted in this matter were both podiatrists; he never consulted an orthopedic surgeon. Dr. Lazar relied on "[m]ost textbooks covering the subject of bunion surgery" (report at 3), but again failed to identify whether those textbooks were podiatric textbooks or orthopedic ones.

This court cannot assume that there is a universal standard of care observed by surgeons of every system or school of surgery. Dr. Lazar did not identify even minimally a standard of care common to all surgeons, podiatrists and orthopedists alike. Nor did he provide evidence of where a podiatric approach and an orthopedic approach would coincide, or why an orthopedic surgeon should adhere to the standards of care appropriate to the subspecialty of podiatric surgery.

Dr. Lazar opined that Dr. Hecht "failed to achieve adequate reduction by three degrees at a minimum," (report at 3) and that "[a]s a result of this neglect, he failed to identify a delayed or non-union as well as an inad-

equate surgical reduction of the intermetatarsal angle." (Report at 4.)

Dr. Lazar opined that "the majority of proximal meta-tarsal osteotomies performed in the United States are treated postoperatively with complete non-weight bearing and lower extremity casting." (Report at 4.) Yet Dr. Lazar never specified if the majority of those surgical procedures were performed by podiatric surgeons or by orthopedic surgeons, again basing his opinion upon unclarified data.

As treatment of a part within the context of the whole is to treatment of one of its decontextualized parts, so is an orthopedic approach to surgery of the foot to a podiatric approach to the same surgery. Medical surgery is a specialty within medicine and orthopedics, which Dr. Hecht specialized in, is a subspecialty within medical surgery. Specifically, orthopedics is defined as "that branch of surgery which is specially concerned with the preservation and restoration of the function of the skeletal system, its articulations and associated structures."[2] Thus, the approach an orthopedic surgeon will take to a patient will be guided by his understanding of the patient's entire skeletal system, including the skeletal system's articulations and associated structures, viewing the foot as one part of the entire system.

By contrast, podiatry, which Dr. Lazar specialized in, is defined as "the care of the foot, including its anatomy,

---

2. Dorland's Illustrated Medical Dictionary 1193 (28th ed. 1994). See 70 C.J.S. Physicians, Surgeons and Other Health-Care Providers §4 (1987): "An 'orthopedist' is one who practices orthopedics, [] or a surgeon engaged in that branch of medicine which deals with the correction of deformities and chronic diseases of the joints and spine."

pathology, medical and surgical treatment, etc."[3] Hence, the approach a podiatric surgeon will take to a patient will be guided by his telescoped focus on the patient's foot, that one part of the patient's overall skeletal system that the podiatrist is specifically trained to study and care for. By way of contrast between the different modalities of treatment, the holistic approach an orthopedic surgeon takes may at times, for example, involve considering amputations, which the restricted approach a podiatrist takes may never consider, nor may a podiatrist consider administering anesthetics that often form part of an orthopedist's holistic approach.

After reviewing Dr. Lazar's report, this court concluded that the scope of podiatry, in this case, did not rise to a legally competent comprehension of an orthopedic manner of preoperatively thinking about and approaching the upcoming surgery or an orthopedic understanding of post-surgical care and treatment. Dr. Lazar provided no evidence that he was significantly familiar with an orthopedist's distinctive holistic modality of performing surgery or with an orthopedist's holistic post-surgical standards of care and treatment. Dr. Lazar never established that the norms by which he judged Dr. Hecht's surgery on, and subsequent treatment and care of, Wexler were norms applicable to orthopedic surgeons.

---

3. *Id.* at 1319. See 70 C.J.S. Physicians, Surgeons and Other Health-Care Providers §5 (1987): "Podiatrist; podiatry. A 'podiatrist' is one who treats only ailments of the human foot, and is distinguishable from a medical or osteopathic doctor who specializes in the treatment of the foot." "Podiatry: is the surgical, medical, or mechanical treatment of any ailment of the human foot, except the amputation of the foot or any of the toes, and also without the use of an anesthetic other than a local one." (internal footnotes omitted)

Moreover, additional differences between orthopedic modalities of surgery and standards of care on the one hand and podiatric ones on the other hand can be inferred from the external indicia of the different kinds of formal training each surgeon had undertaken before commencing practice as a surgeon. As will be shown below, Pennsylvania statutes also reflect differences between the two types of surgery.

As a student, Dr. Lazar never attended a medical school proper, as Dr. Hecht had done; rather, Dr. Lazar attended a school designed to prepare students to practice in the restricted area of podiatric medicine. Dr. Hecht attended The University of Pennsylvania School of Medicine, in Philadelphia, Pennsylvania, and Dr. Lazar attended Temple University School of Podiatric Medicine, in Philadelphia, Pennsylvania. In the respective kinds of schools, the students study the academic, didactic material from vastly different points of view and learn to master not only the manual skills involved in surgery but also how clinically to care for and treat patient postoperatively in the light of those differences. In Pennsylvania, the Podiatric Practice Act reflects those differences by requiring that students pursuing a degree in podiatric medicine, at schools accredited to teach podiatric medicine, follow a required curriculum peculiar to podiatry. "The curriculum taught at schools of podiatric medicine and surgery shall be confined to subjects covered by the definition of podiatric medicine as contained in this Act." 63 P.S. §42.7.

Upon graduation, reflective of the different types of education received, the students from the different kinds of schools receive different degrees: the podiatrist, a

D.P.M., and the physician, an M.D. Graduates from the two kinds of schools sit for different nationally administered board examinations and are certified to practice their respective fields by different state certifying boards. (See 63 P.S. §42.2(b), defining "board" to mean only "The State Board of Podiatry"; and 63 P.S. §422.2, defining "board" to mean only "The State Board of Medicine," and defining "[m]edical doctor" to mean only an individual who has acquired one of six kinds of licenses to practice medicine and surgery issued by the Board of Medicine, where none of the possible licenses includes a license to practice podiatric medicine.) Dr. Lazar was certified by the American Board of Podiatric Surgery, and Dr. Hecht by the American Board of Orthopedic Surgery. Dr. Lazar's last teaching assignment, at Ohio College of Podiatric Medicine, ended in 1996, and since that time he has done nothing more in his academic career but give two isolated lectures, one in 1997 and one in 1998, where neither lecture dealt with orthopedic matters or orthopedic standards of care, which is the central issue in the present case. In contrast, since 1994, Dr. Hecht has maintained a continuous teaching assignment in the area of orthopedics at various medical schools and teaching hospitals in Philadelphia.

There is also some significant disagreement between M.D.s and D.P.M.s about what constitutes the "foot." [4]

_____

4. There is apparently considerable epistemological confusion over the meaning of the "foot." Barbara J. Safriet, *Closing the Gap Between Can and May in Health-Care Providers' Scopes of Practice: A Primer for Policymakers,* 19 Yale J. on Reg. 301, 320 (2002): " 'What is a foot?' Does it include the ankle, or those tissues, ligaments and tendons connecting the ankle and the foot, or those leg bones (the tibia and the fibula) that terminate at the ankle or foot? This definitional

After becoming board-certified, M.D.s are permitted to practice medicine with an unrestricted license, while D.P.M.s are permitted to practice only podiatric medicine. Indeed, in Pennsylvania, "podiatric medicine" is a defined term:

" 'Podiatric medicine' shall mean the diagnosis and treatment including mechanical and surgical treatment of ailments of the foot, and those anatomical structures of the leg governing the functions of the foot and the administration and prescription of drugs incidental thereto. It shall include treatment of local manifestations of systemic diseases as they appear on the foot but shall not include amputation of the leg or foot or treatment of systemic diseases of any other part of the body." 63 P.S. §42.2(a).

The wording of that statute—by restricting podiatric medicine to matters of the foot, prohibiting podiatrists from performing amputations of the leg or foot, and prohibiting podiatrists from treating systemic diseases of other parts of the body—reflects the definitional differences between orthopedics and podiatry that this court set forth above: namely, orthopedics, by considering the entire skeletal system, deploys a holistic approach to surgery that podiatry cannot rise to.

Moreover, according to Pennsylvania law, a podiatrist is a defined health care provider.

---

question and the supplemental question of who decides—the legislature, the podiatry or medical board, or the courts—have provoked a good deal of costly and time-consuming controversy." Safriet points out that courts in Connecticut and Tennessee have wrestled with the problem of defining the foot, despite the definition of the foot offered by the American Podiatric Medical Association. *Id.* at 320-22.

" 'Health care provider.' A primary health care center or a person, including a corporation, university or other educational institution licensed or approved by the Commonwealth to provide health care or professional medical services as a physician, a certified nurse midwife, a podiatrist, hospital, nursing home, birth center and except as to section 711(a), an officer, employee or agent of any of them acting in the course and scope of employment." 40 P.S. §1303.103. (See 63 P.S. §425.2, the Peer Review Protection Act, for a similar, numbered series of different health care providers.)

When construing a statute, this court must construe "[w]ords and phrases . . . according to rules of grammar and according to their common and approved usage; . . . " 1 Pa.C.S. §1903(a). In the instant statute, the General Assembly chose to identify various and different health care providers by listing them in a series separated by commas. It listed, in part, a physician, a certified nurse midwife, and a podiatrist. This court construes the grammatical punctuation of the statute to mean that the General Assembly intended to differentiate physicians from podiatrists, as it differentiated physicians from certified nurse midwives. The difference between physicians and podiatrists is additionally, therefore, legislatively grounded.

Dr. Lazar concluded his report by opining that Dr. Hecht's treatment of Wexler was negligent, and that said negligence was the legal cause of Wexler's damages:

"Given the aforementioned events that took place under the care of Dr. Paul J. Hecht, it must be concluded that a deviation from the normal standard of care took

place, and that this directly resulted in Ms. Wexler's subsequent pain and need for additional surgery." (Report at 4.)

At issue here, therefore, is whether Dr. Lazar can competently testify about the care and treatment rendered by Dr. Hecht, who had performed the instant surgery on Wexler's foot and who cared for and treated her postsurgically.[5]

In light of section 1303.512 of the MCARE Act, as well as long-settled law in Pennsylvania, this court, for the reasons set forth above, holds that Dr. Lazar is not qualified to opine about the alleged negligence of Dr. Hecht or about legal matters of causation. The specialties of orthopedics and podiatry do not sufficiently overlap to qualify Dr. Lazar as an expert in this matter. Dr. Lazar cannot knowledgeably and competently testify about the standard of care in the field of orthopedics. He neither practices in a subspecialty that has a substantially similar standard of care as Dr. Hecht's subspecialty nor is he board-certified by a similar approved board.

Thus, since the differences between an orthopedic and a podiatric school of medicine and their respective standards of care and treatment are clearly evident when considered in the context of this case, this court granted Dr.

---

5. See 70 C.J.S. Physicians and Surgeons §14(a) (1987): "Doing the ordinary work of a podiatrist does not constitute the practice of medicine and surgery within the meaning of a valid statute making it unlawful to practice without a license; but a podiatrist may be amenable to the statute where he performs acts which are outside the scope of podiatry."

Hecht's motion in limine and precluded Dr. Lazar from testifying as a competent medical expert against Dr. Hecht at a trial.

## THE MOTION FOR SUMMARY JUDGMENT

As stated above, Pennsylvania law requires a medical expert's report as one element necessary to sustain a prima facie medical malpractice cause of action. After this court precluded Dr. Lazar from becoming her medical expert, Wexler offered the court no competent expert to testify as to Dr. Hecht's alleged negligence. Consequently, since Wexler failed to meet the necessary elements for a prima facie medical malpractice cause of action, this court additionally granted Dr. Hecht's motion for summary judgment.

In Pennsylvania, it is well settled that "[a]fter the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law . . . (2) if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury." Pa.R.C.P. 1035.2.

A comment on Rule 1035.2 explains, "it is clear that if a defendant is the moving party, he may make the showing necessary to support the entrance of summary judgment by pointing to materials which indicated that

the plaintiff is unable to satisfy an element of his cause of action." Pa.R.C.P. 1035.2, explanatory comment—1996. (citations omitted)

The Pennsylvania Supreme Court has ruled that "[w]e have a summary judgment rule in this Commonwealth in order to dispense with a trial of a case (or, in some matters, issues in a case), where a party lacks the beginnings of evidence to establish or contest a material issue." *Ertel v. Patriot-News Co.,* 544 Pa. 93, 100, 674 A.2d 1038, 1042 (1996). "[T]he function of a summary judgment motion is to avoid a useless trial." *Dillon v. National R.R. Corp. (Amtrak),* 345 Pa. Super. 126, 137, 497 A.2d 1336, 1341 (1985). (citations omitted) "Summary judgment may be granted only where the right is clear and free from doubt." *First Wisconsin Trust Co. v. Strausser,* 439 Pa. Super. 192, 198, 653 A.2d 688, 691 (1995). (citation omitted) Thus, in Pennsylvania it is well settled that "the mission of the summary judgment procedure is to pierce the pleadings and assess the proof in order to see whether there is a genuine need for a trial." *Ertel,* 544 Pa. at 100, 674 A.2d at 1042. (citations omitted) It is further well settled that "the court must examine the record in the light most favorable to the non-moving party and resolve all doubts against the moving party." *Long v. Yingling,* 700 A.2d 508, 512 (Pa. Super. 1997). (citations omitted)

In this matter, Dr. Hecht moved for summary judgment as a matter of law when Wexler failed to produce a competent medical expert able to deliver an expert

report on standard of care matters relevant to Dr. Hecht. As stated above, a report from a competent medical expert is essential to Wexler's medical malpractice cause of action. Since Wexler failed to provide a competent expert, she lacked the evidence necessary to establish negligence against Dr. Hecht. Without that evidence, a trial on this matter would be useless.

After examining the entire record in a light most favorable to Wexler and resolving all doubts against Dr. Hecht, this court concluded that, since Wexler's evidence was legally incompetent, Dr. Hecht's right to summary judgment was clear and free from all doubt.

Having assessed all the evidence, therefore, this court granted Dr. Hecht's motion for summary judgment.

## CONCLUSION

For the reasons set forth above, this court respectfully requests the Superior Court to affirm its December 18, 2002 order that granted defendant/appellee's motion in limine by precluding plaintiff/appellant's witness from testifying at trial as a competent medical expert.

This court also requests the Superior Court to affirm its December 18, 2002 order that granted defendant/appellee's motion for summary judgment by ordering that this case be dismissed due to plaintiff/appellant's failure to provide a medical expert as a necessary element in a medical malpractice cause of action.